## THE PHŒNIX.

## LOWNDES v. THE PHŒNIX.

*(District Court, D. South Carolina. April 5, 1888.)*

1. SHIPPING—LIABILITY OF VESSEL FOR TORT—MASTER AND SERVANT—DEFECTIVE APPLIANCES.

   Libelant, who was one of the gang of the stevedore, was at work in the hold stowing cotton, when a sling containing three bales parted, and one of them fell down the hatchway and struck him, inflicting serious injuries. The vessel at the time was in full charge of the stevedore, who was selected by the charterer and paid by the ship, and who furnished all the hands, including a man at the gangway whose duty it was to warn the men in the hold when the cotton was on the way. This duty he failed to perform. The ship supplied the appliances for loading, and among these were the slings, which, owing to the hard usage, rapidly wore out. The stevedore, his foreman, the gangway man, and the man at the winch all testified that at least one of the slings (there were two) furnished by the mate for this particular gangway had all the appearance of being an old one, and the stevedore and his foreman, to whom the master showed the broken sling after the accident, swore that not only was it dark in color like an old sling, but that its ends at the break were stranded. The testimony of the officers of the ship was to the effect that both slings were entirely new, and had never been used before. The mate, who got possession of the broken sling, and kept it, admitted on his examination, which was *de bene esse*, that it was on the ship. The ship was then in port, but the sling was not produced at the trial. In addition, the foreman of the stevedore testified that he had frequently called the attention of the mate to the unsafe character of the slings. *Held*, that as a matter of fact the sling was an old one, and it being the duty of the ship to furnish the stevedore with safe appliances, the ship was liable.

2. SAME—NEGLIGENCE OF FELLOW-SERVANT.

   A vessel taking in a cargo of cotton was in full charge of the stevedore, who furnished all the hands, including a man at the gangway and others in the hold. It was the duty of this man to warn the men below when the cotton was on the way. This he failed to do, and, a sling breaking, one of the bales fell down the hatchway and struck the libelant, who was employed by the stevedore to stow the cotton. The immediate cause of the accident was the rope of which the sling was made, and which was old. It was the duty of the ship to supply these slings, and to see that they were in good condition. The libelant was permanently disabled by the accident for the most exacting duties of a longshoreman, though he was not incapacitated, with his experience and skill, from making a living. He was confined to bed a considerable period by his injuries, and lost much time. *Held*, the negligence of the ship being the immediate cause of the accident, that the fact that the negligence of a fellow-servant contributed thereto was not, in admiralty, matter in discharge, but only in mitigation of damages; and that $1,500, with $75 as doctor's fees, should be allowed.

In Admiralty. Libel for damages for personal injuries.

*Inglesby & Miller* and *I. P. K. Bryan*, for libelant.

*I. N. Nathans*, for respondent.

SIMONTON, J. The libel is for injuries sustained by libelant on board of the steam-ship Phœnix, on 11th February, 1888, she being at the time at Adger's wharf, in this port. The steam-ship, taking in a cargo of cotton, was in full charge of a stevedore, selected by the charterer, and paid by the ship. She furnished the appliances for loading,—derrick, windlass, blocks, chains, rope slings, and the steam for the winch. The

stevedore furnished all the hands, including a man at the steam-winch, and a man at the gangway. The duty of the latter was to pass out the slings, and to give notice that the cotton was coming aboard, so that the men working in the hold should keep from under the hatch. The stevedore had been engaged during the week in loading at the other hatches of the steamer. On Saturday, a little after 1 o'clock P. M., he began for the first time to put cotton into the No. 4 hatch. He asked for rope slings for that hatch. The mate, whose duty it was to furnish them, gave him two. Two rope slings are needed for each hatch. In each sling are put three bales. They are then hauled from the wharf by the appliances mentioned, going up towards the hatch on a skid, which is an incline of some 55 or 60 deg. As they reach the combing of the hatch, they are raised above it, over the hatchway, and should be let down gradually into the hold. The gangway man gives notice as the bales are on their way. Between 4 and 5 o'clock on this afternoon libelant was at work, one of the gang of the stevedore in the hold of hatch No. 4. He had just reached forward to get from under the hatchway an implement of his calling, known as a "Dolly Varden," when a bale of cotton was precipitated down the hold, striking him, and inflicting serious injuries upon him. No warning whatever was given by the gangway man. His excuse is that the bales came so fast he had no time to give it. The circumstances attending the accident are these. Three bales, as is usual, were put into the sling. They came up the skid, steam having been put on the winch. When they got to the combing of the hatch, perhaps just as they got on a level with the top of the combing, the sling parted. Two of the bales fell on the deck, the other went down the hold and struck libelant.

When a stevedore has full charge of the loading or unloading of a vessel, and one of his gang suffers injury by reason of defective tackle furnished by the vessel, she is responsible if there be absence of due care upon the part of her master in furnishing the tackle, or in maintaining it in a safe condition; that is to say, if he knew, or if the circumstances were such as to put him on the inquiry so that he could know, that the tackle was not safe. *The Rheola*, 19 Fed. Rep. 926; *The Harold*, 21 Fed. Rep. 428; *The Carolina*, 30 Fed. Rep. 200, affirmed, 32 Fed. Rep. 112; *The Dago*, 31 Fed. Rep. 574. The general principle appears in *The Malek Adhel*, 2 How. 210, and it is illustrated in *The Yoxford*, 33 Fed. Rep. 521. The question in this case is, was the sling thus furnished by the ship on this afternoon defective within the knowledge of the officer furnishing it, or were the circumstances such as to put him upon inquiry as to its condition? The sling had been in use only two hours when it parted. On this essential question the testimony is contradictory. The stevedore, his foreman, the gangway man, and the man at the winch, all of whom handled the sling, swear that one at least of the slings furnished for and used in hatch 4 that afternoon was very dark in color, having all the appearance of an old sling. Two of these, the stevedore and his foreman, to whom the master exhibited the broken sling after the accident, swear that it not only was very dark in color, like an old sling,

looking on the outside black and scraped, but that its ends at the break were stranded. On the other hand, the officers of the ship swear that the two slings furnished for hatch 4 on that afternoon were entirely new, had never been used, had been cut from a fresh coil of rope recently purchased; that it had the bright color of new Manilla rope; that its edges at the points of parting were clean, appearing to have been cut short off with some sharp instrument. The testimony cannot be reconciled. New Manilla rope used on smooth skids for two hours and a little more could not be made to assume the appearance of old rope. In this contradiction of testimony we must examine even small facts. Just after the accident occurred the first mate of the steam-ship sent a man into the hold and got the broken sling. He kept possession of it. It was shown on Monday to the stevedore. The master, mates, and crew were examined *de bene esse* a few days afterwards. The mate, on cross-examination, was asked as to this sling. He replied that it was aboard ship. The ship was in port. The examination of respondent's witnesses went on the next day. The rope was never produced, nor was any offer made to produce it. Now, the issues between these parties were: What caused the sling to break? Was it of new rope or of old? Did it part because of its inherent weakness, discernible on examination? Was it cut by the iron bands around the bales, as was very possible? Was it broken in a violent concussion of the bales against the combings of the hatch through the unskillfulness of the winchman? If the rope was a new one, if the ends were clean cut, if the break was the result of a sharp and violent blow, the ship would not be liable. The bare production of the rope would have demonstrated the theory of respondent. He had full notice of its importance, and opportunity to produce it. The rope was not produced. Why? It is difficult, if not impossible, to escape the conclusion that the rope was not produced because its production would have contradicted the theory of the defense. As matter of fact, I find that the sling which parted was an old one. This being the case, was the ship responsible? The wear and tear in use of these slings is very great. They cannot be used with safety after loading a vessel with 1,000 bales of cotton. When the cotton in the slings comes aboard it moves rapidly and always, or almost always, strikes violently against the combing of the hatch. When, therefore, the foreman of the stevedore asked for new slings for this hatch he was entitled to new ropes or ropes as safe as new ones. If an old sling was furnished, it should have been examined. An examination may have developed that it was not safe. No examination was had. Thus there was a want of due care, which is negligence, and for this the ship is liable. Add to this the evidence of the foreman of the stevedore, that he had repeatedly called the attention of the mate to the unsafe character of the slings, and the conclusion is strengthened.

In determining the extent of the liability of the ship other considerations, however, enter into the question. The gangway man failed in his duty, and gave no warning. It may be—but on this point the evidence is not strong—that the man at the winch was unskillful. Both of them

were in the gang of the stevedore, paid and employed by him. But for the negligence of the one, perhaps the action of the other, the accident might not have happened. The libelant was the fellow-laborer with these men, and their negligence was one of the risks of his employment. He assumed this, and is affected by it. *Hough* v. *Railway Co.*, 100 U. S. 213; *The City of Alexandria*, 17 Fed. Rep. 390; *The Harold*, 21 Fed. Rep. 428. This, however, does not exonerate the ship. Even in the narrow administration of the common-law courts the negligence of an employe will not excuse the common master for an injury to a fellow-servant if the master himself was negligent, (*Railway* v. *Cummings*, 106 U. S. 700, 1 Sup. Ct. Rep. 493;) and in the broad and liberal administration of admiralty contributory negligence on the part of the libelant himself would not exonerate the ship. This being so, still the negligence for which libelant would have been directly responsible, and the negligence of a fellow-servant, the risk of which he assumed, will diminish the amount of damages to be awarded to him. This, then, is the last question in the case. The libelant has been disabled, in some respects; for the most exacting duty of a longshoreman, permanently disabled. With his experience and skill, he can still make a living. He has been confined to his bed,—still is,—and has lost much time. I award him as damages the sum of $1,500, not including his physician's fees. Towards these I allow him $75. Let a decree be entered accordingly; respondent to pay costs.