### THE JOSEPH B. THOMAS.

### JENSEN v. THE JOSEPH B. THOMAS.

#### (District Court, N. D. California. April 26, 1897.)

1. EVIDENCE—PRESUMPTIONS—FAILURE TO CALL WITNESS.
   Failure of defendant to call as witnesses employés, who, as shown by other evidence, may probably have committed an act of negligence resulting in the injury complained of, raises a presumption that their testimony, if produced, would be unfavorable.

2. NEGLIGENCE—PERSONAL INJURIES—PROXIMATE OR EFFICIENT CAUSE.
   It is no defense to an action for a negligent injury that the negligence of a third person, or an inevitable accident, or an inanimate thing, contributed to the injury, if the prior negligence of the defendant was the efficient cause of the injury.

3. SAME—MASTER AND SERVANT.
   An employer is liable for the concurring negligence of himself and a fellow servant of the injured employé to the same extent as if the injury had been caused entirely by his own negligence. This rule prevails in admiralty as well as at common law.

4. SHIPPING—INJURY TO STEVEDORE—LIABILITY OF VESSEL.
   The owners of a vessel owe a personal duty to the members of a stevedore's gang to provide reasonable security against dangers to life or limb.

5. SAME.
   The placing by one of the crew of an empty water keg upon the loose hatch covers at the side of the hatch, to dry after painting, in a position where an accidental shock or jarring of the covers may tip it into the hatch while stevedores are working in the hold, is such negligence as renders the vessel liable for injury so caused to a stevedore.

6. NEGLIGENCE—PERSONAL INJURIES—PRESUMPTION FROM OCCURRENCE OF ACCIDENT.
   The occurrence of an injury may itself, in connection with other circumstances, sufficiently show negligence to justify a judgment for damages, when the thing causing the injury is under the management of defendant, and the accident is such as, in the ordinary course of things, does not happen if ordinary care is used by those having the management.

Libel in rem to recover $10,000 as damages for personal injuries alleged to have been sustained in consequence of the negligence of the master of the vessel, and of those intrusted by the owners of said vessel with its care and management.

Frank P. Prichard and Walter G. Holmes, for libelant.

Andros & Frank, for claimants.

MORROW, District Judge. This is a libel in rem against the ship Joseph B. Thomas to recover the sum of $10,000 as damages for personal injuries alleged to have been sustained in consequence of the negligence of the master of the vessel, and of those intrusted by the owners of said vessel with its care and management. The libelant was one of a gang of stevedores engaged in loading the ship Joseph B. Thomas at the port of Philadelphia, and was injured on the afternoon of April 11, 1892, while at work in the lower hold of the vessel, under the forward hatch. The gang of stevedores, including the foreman, consisted of 14 men. They had been engaged in loading case oil. At the time of the accident most of the men, including the

libelant, were at work in the lower hold, under or near the forward hatch, engaged for the most part in tearing up a stage which had been put up in the hold in order to render the work of loading more easy. The testimony indicates that 9 of the gang of 14 men were located in the place just referred to; that the foreman and 2 other men were in the between-decks, at the forward hatch; that the burden tender was at the main hatch, some 50 feet away; and that the engineer was on the wharf. The hatch covers, consisting of three pieces, had been taken off that morning, presumably by the stevedore's gang, although it does not appear which of the men performed that service. They were piled one on top of the other, forward of the forward hatch on the main deck, and, so far as the evidence discloses, were piled in the usual and proper manner. It is true that the second mate, who testified on behalf of the claimants, stated that he noticed that day that the hatch covers were improperly piled up, but I am unable to accept this testimony, uncorroborated by any other witness, as I seriously doubt the credibility of the testimony of the second mate in other material respects. These hatch covers were somewhat curved. The hatch combings were about 9 or 10 inches high, and the covers, piled one on top of the other, were nearly flush with the hatch combings. A keg belonging to the ship, which had been freshly painted, was placed by some one on these hatch covers to dry. This keg was knocked over into the hatchway, and, in its fall, struck the libelant on the head, inflicting some very severe injuries. Before referring to the testimony on both sides as to the manner and the cause of libelant's injuries, it is proper to say that no question of contributory negligence is raised in the case. The libelant was in the lower hold, under the forward hatch, where he had a right to be, and was then in the discharge of his duties as one of the gang of stevedores. The libelant contends that he was injured by reason of the negligence of those then in charge of the vessel in placing the keg on the hatch covers at too close proximity to the hatchway, into which, if accidentally jarred or moved, it was liable to roll or fall, to the danger of those of the stevedore's gang who were working below under the hatchway. It is further claimed in this connection that the keg was knocked over by some one connected with the vessel, while hastening to assist the second mate to climb up out of the forward hatch from the between-decks to the main deck. On the other hand, the claimants contend that the person who knocked the keg over was one of the stevedore's gang, and a fellow servant of the libelant, and that, therefore, the vessel is not responsible in law for any injuries sustained to the libelant thereby. The testimony is irreconcilably conflicting. In this connection the evidence of two witnesses, not connected with the ship nor with the stevedore's gang, who happened casually to be on board the vessel at the time the libelant was injured, is of great importance in enabling the court to arrive substantially at the real state of facts. These two witnesses, so far as the evidence discloses, appear to be disinterested. It may also be observed at the outset that the testimony of the libelant himself is of little value in determining how and through whose fault the injury arose. All that

he knows about the accident is that he was at work in the lower hold, under the fore hatchway, when a keg fell and struck him on the head, rendering him unconscious. The testimony of the two witnesses just referred to is as follows: John F. Fitzgerald testified: That he was employed along the wharf by the Pennsylvania Railroad Company. That on the 11th of April, 1892, he went on board the ship Joseph B. Thomas. That he went on board with a young man who desired to obtain a piece of rope. That at the time of the accident he was standing right over the hatch. That "the mate was between-decks, and he started to come up to get on the main deck. Mr. O'Donnell was helping him up, to get up on the main deck. A young fellow on the ship started to run around to help the mate to get him up on the main deck, and he tread on that hatch, and that hatch upset the barrel, and the barrel fell down in the hold. It wasn't a barrel. It was a keg." That the keg was standing "right on the corner of the hatch. The hatches were taken off, and then put one on top of the other, and the keg set over; and, when you tread on that corner of the hatch, that turned the keg over, and it rolled down the hatch before anybody could get hold of it." He stated that the person who trod on the hatch was "a young man belonging to the ship." On cross-examination he reaffirmed several times the answer that it was a young man belonging to the ship who stepped on the hatch covers, and that he had seen him several times before that on deck, having had, previously, occasion to go on board the vessel. He frankly admitted, however, that he did not know the young man's name, and he did not know in what capacity he was employed on board the vessel. He did not know "whether he lived there or not. Sometimes they live ashore. Sometimes they sleep aboard and eat ashore." William B. Gray, the person who accompanied the witness Fitzgerald on board the vessel, and was present when the accident occurred, testified:

"I went aboard for a piece of rope. I asked Mr. O'Donnell, the boss of the stevedores, and he said he hadn't any, and called to the mate. The mate said he would get me a piece. The mate was about climbing up the forward stanchion of the ship to the main deck. The hatching was laying there (that is, the covering of the hatch was laying forward of the hatch), and the cask sitting on the covering of the hatch; and, as the mate came up to get hold of the combings, Mr. O'Donnell gave him a lift, and one of the men helping him there (I supposed him to be a sailor) tread on the end of the hatch, and threw the cask up in the air, and it went down in the hold. Mr. O'Donnell was helping the mate."

On cross-examination he states that he was standing aft of the forward hatch; that he cannot swear with any certainty who it was that stepped on the hatch covering; that he would not swear that the person who did step on the covering was a sailor connected with the ship. On redirect examination he states that he could not tell whether the man who upset the cask was a full-grown man, as, from where he was standing, he could not see him at all. This version of the accident given by these two witnesses is corroborated by the testimony of the foreman of the stevedore's gang, and at least two of the stevedores themselves. O'Donnell, the foreman, thus describes the accident:

"After I got the stage up, I used short wood to chock it, and the second mate of the ship jumped down to see how much short wood I was using. He came down to see whether I was using too much. He stood there a minute, and said it was all right. He started to climb up the forward stanchion of the forward hatch. He got up as far as the combings, when he put his hand over, and sung out to a boy, to the best of my knowledge, to give him a hand to pull him over, and that's all I could see of it. I gave him my hand, put it under his foot to help him over, and I heard somebody halloo, 'Under!' and when I looked down the hatch I saw this man laying on the floor of the ship; that is, Jensen."

On cross-examination he reaffirmed the statement that the mate (meaning the second mate) was in the between-decks. He was unable, however, to say who it was that went forward to help the mate up, as he was in the between-decks. Martin Ryan, one of the stevedores, testified that he was in the lower hold, tearing up the oil stage, and he relates what he saw of the accident as follows:

"All I saw, I saw the second mate climbing up from between-decks on the upper deck, under the gallant forecastle. The next I heard was, 'Look out below!' I jumped into the wing of the vessel to get out of the way, and I looked around, and I saw the keg laying there, and Jensen laying down."

Chris. Nelson, another of the stevedores, stated that he was in the between-decks, helping O'Donnell, the foreman. In answer to the question, "State all that you know of the accident," he replied:

"There was no ladder in the hatch. The second mate came down the stanchion, sliding down on the stanchion, and he went up the same way, and as he went up this keg came down. He hallooed to one of the boys or young men belonging to the ship to help him out of the hatch, and Mr. O'Donnell, the foreman, helped him up, and the keg came down, and that's all I know."

He admits on cross-examination that he didn't see who it was that came to the assistance of the second mate. In reply to the question put to him on cross-examination, "Did you see that keg before?" he replied:

"Yes, sir; I saw it that forenoon. A young man was sitting, painting it, and set it there to dry on the hatches. Q. Which end was it on? A. On the forward part of the hatch covering,—on the port side."

This constitutes the testimony on the part of the libelant indicating how the accident happened. As against this evidence, the second and third mates testified substantially as follows: Edward Peterson stated that he was the second officer of the vessel at the time; that when the libelant was injured he (the second mate) "was up alongside the hatch combing on the main deck"; that the third mate was a little away from him. He thus describes the accident:

"There was a little keg standing on one corner of the hatch cover,—on the port corner of the hatch cover; and one of the men happened to touch the top hatch cover on the starboard side, and through that it started the keg off the hatch cover, and the keg went down through the hatch and struck the man. * * * Q. Who was the man that trod on this hatch cover? A. One of the stevedore's men. Which one it was, I cannot say. Q. It was one of the stevedore's men, but you do not know his name? A. No, sir; I did not take particular notice which one it was. Q. Were any others of the stevedore's men underneath the topgallant forecastle, except this one that trod on the hatch? A. I don't think there was. Q. What was this stevedore's man doing when he trod upon the hatch cover? A. I don't know exactly what he was doing. He just happened to come along and touch the hatch cover. Either he was going down the hatch, or what he was going to do I don't know. I know he just happened to touch the hatch cover the least mite."

On cross-examination he testified as follows:

"Q. What were you doing at the forward hatch at that time? A. I was not doing anything. I was doing something under the top forecastle, and stopped to look down in the hatch to see what they were doing. We were taking in cargo, and I looked down occasionally while they were taking in cargo. * * * Q. What were you doing under the forecastle head? A. I don't exactly recollect what I was doing. I had underneath there two boys and the third mate, finishing something I was doing. I cannot recollect now what I was doing. There is always something."

Henry Hannum testified that he was the third mate of the vessel; that at the time the libelant was injured he was standing under the topgallant forecastle, about three feet away from the forward hatch, and that he was looking right over the hatch; that one of them trod on the hatch, and the hatch tilted, and the keg rolled off and fell down; that one of the stevedore's men trod on the hatch; that he thinks one of the boys connected with the ship was also under the topgallant forecastle, besides the second mate and himself; that he thinks that the man who trod on the hatch came out of the water-closet; that he does not know the name of this man. This witness was subsequently recalled, and deposed as follows:

"Q. Just at and immediately before the time that the cask fell into the hold, by which Jensen was injured, had the second mate come up from the between-decks? A. No, sir. Q. If, just at the time that the cask fell into the hold, by which Jensen was injured, the second mate came up from the between-decks through the fore hatch, could you have seen him? A. Yes, sir. Q. If any stranger from the shore had come in on the main deck under the topgallant forecastle, and had asked the second mate to give him a piece of rope, in your opinion, would you have heard him? A. Yes, sir. Q. Did any person from the shore come on board the ship just before the accident happened, under the topgallant forecastle, and request the second mate, or any other person there, to give him a piece of rope? A. No; I didn't see anybody, and there was nobody there. Q. Did any person belonging to the ship, as one of the company of the ship, tread on the hatch covers, by reason of which the cask by which Jensen was injured was precipitated into the hold? A. No, sir. * * * Q. A witness by the name of John F. Fitzgerald has testified in this case as follows: 'That at the time of the accident the mate was between-decks, and he started to come up to get on the main deck. Mr. O'Donnell was helping him up to get on the main deck. A young fellow on the ship started to run around to help the mate to get him up on the main deck, and he trod on that hatch.' Is that true? A. No, sir."

It is clear from the testimony of this last witness, and that of the second mate, that either the testimony of the witness Fitzgerald and of the person who accompanied him on board the vessel, as well as the corroboratory testimony of the foreman, O'Donnell, and of the two stevedores, is false, or else the testimony of the second and third mates is absolutely untrue. After a careful consideration of the evidence in the whole case, I prefer to accept the testimony of the witness Fitzgerald, corroborated as it is by that of Gray, O'Donnell, Ryan, and Nelson, as presenting the real state of facts. I reach this conclusion, not for the reason alone that the number of witnesses on the part of the libelant is greater than that for the claimants, but largely from the inherent probabilities and improbabilities of the two stories. In the first place, every one connected with the stevedore's gang on that day was called by the libelant, and not one of them stated that he was the person who trod on the hatch cover. On

the contrary, each one of them related where he was working at the time of the accident, and not one of them was on the main deck except the burden tender, John F. Davidson; and he testified that he was at the main hatch, not the fore hatch, some 50 feet away, thereby precluding any inference that it might have been one of the stevedores who stepped on the hatch covers. On the other hand, it is a significant fact that the two young men, or "boys," so called, who, it was testified to by the second and third mates, were on board at the time, and were connected with the vessel, were not called by the claimants; nor does it appear that any particular effort has been made to obtain their depositions, although they remained with the vessel until she reached San Francisco, where the depositions of the second and third mates were taken. The captain himself admits that they remained by the ship some three or four days; that they were paid off the third day after the ship arrived. Their testimony would have been most important in dissipating any doubt as to who it was that stepped on the hatch cover; particularly in view of the fact that the testimony of the witnesses called for libelant, while it fails to identify specifically who it was that trod on the hatch cover, indicates that the person who did so was a young man. The very strong inference which naturally arises from this testimony, in view of the testimony produced on behalf of the claimants themselves, that two young men were attached to the vessel and were then on board, and at the time of the accident were quite close to the fore hatch, is that this person must have been one of the two young men referred to. The failure of the claimants to call these two young men, and the explanation sought to account for this failure, are unsatisfactory, and do not dispel the presumption raised against the claimants, that the testimony of these witnesses, if produced, would have been unfavorable. This is a well-settled rule of evidence, not only in civil, but also in criminal, cases. As was well said by Lord Mansfield in Blatch v. Archer, Cowp. 63, 65:

"It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted."

Mr. Starkie, in his work on Evidence (volume 1, p. 54), thus lays down the rule:

"The conduct of the party in omitting to produce that evidence in elucidation of the subject-matter in dispute which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice."

See, also, Com. v. Webster, 5 Cush. 295, 316; People v. McWhorter, 4 Barb. 438; Railway Co. v. Ellis, 10 U. S. App. 640, 4 C. C. A. 454, and 54 Fed. 481.

In the last case it was held that the failure to produce an engineer as a witness to rebut the inferences raised by the circumstantial evidence would justify the jury in assuming that his evidence, instead of rebutting such inferences, would support them. The failure of the claimants to obtain the testimony of these two young men confirms my conviction that the person who ran to the assistance of

the second mate, and stepped upon the hatch cover, was one of the young men, or "boys," so called, who belonged to the vessel, and were on board at the time. It seems but natural that, when the mate called for help, one of the young men who were under the topgallant forecastle, not very far away from the fore hatch, should respond with such alacrity to his superior's call. I conclude, therefore, that it was one of these young men, and not one of the stevedores, who stepped on the hatch covers, upsetting the keg, and that in no view of the case can the act of tipping the hatch cover, and causing the keg to roll into the hatchway, be construed as the act of a fellow servant.

But it is immaterial, in my opinion, whether the person who stepped on the hatch cover was one of the young men connected with the vessel, or whether it was one of the stevedores, if the act of placing the keg on the hatch cover to dry was a failure to observe ordinary care, or, in other words, was culpable negligence, on the part of those connected with the vessel; for it is well settled that it is no defense in an action for a negligent injury that the negligence of a third person, or an inevitable accident, or an inanimate thing, contributed to cause the injury of the plaintiff, if the negligence of the defendant was the efficient cause of the injury. 16 Am. & Eng. Enc. Law, p. 440, and cases there cited. Shearman & Redfield, in their work on Negligence (3 Ed., § 10), give the general rule as follows:

"Negligence may, however, be the proximate cause of an injury of which it is not the sole or immediate cause. If the defendant's negligence concurred with some other event (other than the plaintiff's fault) to produce the plaintiff's injury, so that it clearly appears that but for such negligence the injury would not have happened, and both circumstances are closely connected with the injury in the order of events, the defendant is responsible, even though his negligent act was not the nearest cause in the order of time."

Thompson, in his work on Negligence (volume 2, p. 1085), says:

"Where an injury is the combined result of the negligence of the defendant and an accident for which neither the plaintiff nor the defendant is responsible, the defendant must pay damages, unless the injury would have happened if he had not been negligent;" citing a number of cases in a note.

It is also another rule of the law of negligence that the employer is liable for the concurring negligence of himself and a fellow servant of the injured employé to the same extent as if the injury had been caused entirely by his own negligence. Railway Co. v. Cummings, 106 U. S. 700, 1 Sup. Ct. 493; Railway Co. v. Sutton, 11 C. C. A. 251, 63 Fed. 394; Railway Co. v. Chambers, 15 C. C. A. 327, 68 Fed. 148, 153, and cases there cited. The same rule prevails in admiralty. The Phœnix, 34 Fed. 760. In the case of City of Clay Centre v. Jevons, 44 Pac. 745, 2 Kan. App. 568, it was decided that where the plaintiff had not been guilty of contributory negligence, and the injury complained of would not have resulted but for the negligence of the defendant, a recovery may be had, notwithstanding the primary cause of the injury may have been an accident for which the defendant was not responsible. In Benjamin v. Railway Co. (Mo. Sup.) 34 S. W. 590, it was held that, where the plaintiff was injured by the tilting of the cover of a manhole maintained by the defendant

in the sidewalk in front of his premises, the fact that an independ-ent contractor, who delivered coal to the defendant, negligently failed to replace the cover properly, will not relieve defendant from liability, if the negligent construction of the cover directly contributed to plaintiff's injury. Under these rules of law, the important inquiry, manifestly, is whether the act, by those in charge of the vessel, in placing the keg on the hatch covers to dry at such close proximity to the hatchway, was negligence, and whether such negligence con-curred with the accidental tipping of the hatch covers to produce the injury to the libelant. The claimants owed a duty to libelant, as one of the stevedore's gang, to provide reasonable security against danger to life or limb. The Kate Cann, 2 Fed. 241, 245; The Helios, 12 Fed. 732; The Max Morris, 24 Fed. 860; The Guillermo, 26 Fed. 921; The Phoenix, 34 Fed. 760; Crawford v. The Wells City, 38 Fed. 47; The Nebo, 40 Fed. 31; The Terrier, 73 Fed. 265; Leathers v. Blessing, 105 U. S. 626. See, also. The Frank, 45 Fed. 494, where many of the authorities are cited. This duty is a personal one. Railroad Co. v. Baugh, 149 U. S. 368, 386, 13 Sup. Ct. 914; The Pioneer, 78 Fed. 600, 608. In Clark & L. Torts, pp. 370–376, it is stated that:

"The owner of premises owes a duty towards those whom he invites there, to take care to see that the premises are in a fit state of repair; and if, owing to his omission to exercise care in this respect, bricks or tiles, or other portions of the structure of a building, fall upon them, he is liable. Similarly will he be liable if he negligently leaves some chattel, such as a bale of goods, deli-cately poised in such a position as to be likely to fall and injure them. * * * To establish the defendant's liability, his negligence need not necessarily have been the immediate cause of the injury. Provided it be a substantial part of the cause, he will be none the less liable because the injury may have been contributed to by the intervening negligence of a third person. Abbott v. Macfie, 2 Hurl. & C. 744; Clark v. Chambers, 3 Q. B. Div. 327."

While there is no direct testimony that the keg was placed on the hatch covers at such close and dangerous proximity to the hatchway by some one connected with the vessel, still the strong probabilities of the situation, and the natural and reasonable inference to be drawn therefrom, convince me that it was placed there by some per-son connected with the vessel. It is difficult to imagine how else it could have got there; for, although every one of the stevedore's gang was called as a witness, not one of them deposed that he had placed it there. In fact, it did not belong to them. It was the property of the vessel, and was used to contain drinking water. Nelson, one of the stevedores, testified that he saw a young man painting this identical keg the morning of the accident, "and set it there to dry on the hatches." The failure to call these two young men not only leaves us without their testimony on this point, but, under the rule of evidence heretofore referred to, raises a presumption against the claimants that their testimony, if produced, would have been unfavorable. As the witness Nelson has not been contradicted. I think it may safely be assumed that the keg was placed on the hatch covers to dry by the same "young man" who was engaged in painting it the morning of the accident, and who was connected with the ship. Perhaps the most significant circumstance is the fact that

it belonged to the ship. That this, under the circumstances of the case, was such negligence as to render the claimants liable for the consequential injury to libelant, is, I think, clearly established by the testimony. It was certainly a dangerous place to put the keg to dry. It was dangerous to those working under the hatchway. The event itself demonstrates this feature of the case. The mere fact that loading was going on should have been sufficient to indicate to those in charge of the vessel the danger of placing and leaving a small, empty keg, liable to be easily knocked over, on the hatch covers, at such close proximity to the hatchway. The testimony shows that the hatch covers, three in number, were laid one on top of each other, and the topmost one was nearly level with the hatch combings. The risk, therefore, of the keg being tipped or knocked into the hatchway, should have been apparent. And the negligence was all the more culpable, in that the hatch covers were somewhat curved,—that is, there was "a little crown to the hatch" (testimony of the second mate),—making the liability of a small, empty keg being tipped or overturned all the more imminent, and dangerous to those working under the fore hatch. It was this negligence which was the real, efficient cause of the accident; and it was, in my estimation, such negligence that a man of ordinary experience and intelligence could and should have foreseen the results that probably might ensue. Shear. & R. Neg. (3d Ed.) § 10.

Counsel for the claimants contends that there is not sufficient evidence of negligence to justify fastening any responsibility upon the claimants for the injury to the libelant, and that the latter has failed to prove any negligence on the part of those in charge of the vessel. It is undoubtedly true that, in actions for injury resulting from the negligent acts of others, the burden is on the plaintiff to make out a prima facie case of negligence; but it is also true that there is a class of cases where the act of injury itself, in connection with other facts and circumstances, sufficiently establishes that there was negligence to justify a judgment for damages. The general rule is well stated in Scott v. Docks Co., 3 Hurl. & C. 596, 601, by Erle, C. J., as follows:

"There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as, in the ordinary course of things, does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

The case was on appeal in the exchequer chamber from a decision in the court of exchequer in making absolute a rule to set aside the verdict for the defendants and for a new trial. It appeared that the plaintiff, in an action against the dock company for an injury to him by the alleged negligence of the dock company, proved that he was an officer of customs, and that while passing, in the discharge of his duty, in front of a warehouse in the dock, six bags of sugar fell upon him. It was held that this afforded reasonable evidence of negligence to be left to the jury.

In Byrne v. Boadle, 2 Hurl. & C. 722, it appeared that plaintiff

was walking in a public street, past the defendant's shop, when a barrel of flour fell upon him from a window above the shop, and seriously injured him. It was held that this was sufficient prima facie evidence of negligence for the jury to cast on the defendant the burden of proving that the accident was not caused by his negligence. Pollock, C. B., in delivering the opinion, said:

"The learned counsel was quite right in saying that there are many accidents from which no presumption of negligence can arise, but I think it would be wrong to lay down as a rule that in no case can presumption of negligence arise from the fact of an accident. Suppose, in this case, the barrel had rolled out of the warehouse and fallen on the plaintiff; how could he possibly ascertain from what cause it occurred? It is the duty of persons who keep barrels in a warehouse to take care that they do not roll out, and I think that such a case would, beyond all doubt, afford prima facie evidence of negligence. * * * Or if an article calculated to cause damage is put in a wrong place, and does mischief, I think that those whose duty it was to put it in the right place are prima facie responsible; and, if there is any state of facts to rebut the presumption of negligence, they must prove them. The present case, upon the evidence, comes to this: A man is passing in front of the premises of a dealer in flour, and there falls down upon him a barrel of flour. I think it apparent that the barrel was in the custody of the defendant, who occupied the premises, and who is responsible for the acts of his servants who had control of it; and in my opinion the fact of its falling is prima facie evidence of negligence, and the plaintiff, who was injured by it, is not bound to show that it could not fall without negligence, but, if there are any facts inconsistent with negligence, it is for the defendant to prove them."

In the case of White v. France, 2 C. P. Div. 308, it appeared that a bale of goods was left nicely balanced on the edge of a trap-door, and fell upon a passer-by. The occupier of the premises was held liable for negligence in this respect. In Briggs v. Oliver, 4 Hurl. & C. 403, the plaintiff, going to a doorway of a house in which the defendant had offices, was pushed out of the way by his servant, who was watching a packing case belonging to his master, and was leaning against the wall of the house. The plaintiff fell, and the packing case fell on his foot and injured him. There was no evidence as to who placed the packing case against the wall, or who caused it to fall. The court held that there was a prima facie case against the defendant, to go to the jury. The same doctrine is thoroughly discussed and enunciated in the leading English case of Kearney v. Railway Co., L. R. 5 Q. B. 411, affirmed L. R. 6 Q. B. 759. The rule is the same in this country. An excellent statement of the law, as deduced both from the English and American cases, will be found in the case of Howser v. Railroad Co., 80 Md. 146, 30 Atl. 906. All the leading cases on the subject are reviewed or referred to by the court. There it appeared that the plaintiff, while walking in a footpath along the roadbed of the defendant, but not upon its right of way, was injured by half a dozen cross-ties which fell upon him from a gondola car attached to a train passing on defendant's road. It was held that these facts gave rise to a presumption of negligence on the part of the defendant; and the ruling of the trial court, that upon the pleadings, and the evidence given to the jury by the plaintiff (the defendant not having given any evidence), he was not entitled to recover, was reversed, and a new trial ordered. In the course of a learned opinion, Roberts, J., said:

"Whilst the general rule undoubtedly is that the burden of proof that the injury resulted from negligence on the part of the defendant is upon the plaintiff, yet in some cases 'the very nature of the action may, of itself, and through the presumption it carries, supply the requisite proof.' Whart. Neg. par. 421. Thus, when the circumstances are, as in this case, of such a nature that it may fairly be inferred from them that the reasonable probability is that the accident was occasioned by the failure of the appellee to exercise proper caution, which it readily could and should have done, and in the absence of satisfactory explanation on the part of the appellee, a presumption of negligence arises against it."

The supreme court of California has also enunciated the same doctrine. Pastene v. Adams, 49 Cal. 87; Dixon v. Pluns, 98 Cal. 384, 389, 33 Pac. 268. In Pastene v. Adams it appeared that the defendants were lumber dealers, and that they had piled lumber carelessly, so that the ends of some of the timbers projected more than others into the gangway. While the plaintiff was walking close to the timbers, a stranger drove a team from the yard through the gangway to the street, and in so doing the wheel caught the end of one of the timbers and threw it down, and the plaintiff was injured thereby. In an action brought to recover damages caused by the falling of the lumber, it was held, substantially, that, if the lumber was thus carelessly piled up, the facts that it remained in that condition a long time before the injury, and that the lumber was caused to fall by the negligence of a stranger, were no defense; that the negligence of the defendant concurring with the negligence of a stranger was the direct and proximate cause of the injury. This case is directly in point, not only on the general proposition of the claimants' liability for their negligence concurring with the accidental tipping of the keg, but also upon the point sought to be made by counsel for claimants, that, as the keg had lain on the hatch covers for some hours before the accident, and nothing had happened, its presence there was not dangerous, and was not negligence. In the case cited it appeared that the lumber had been piled up and had lain in a dangerous condition for several months, yet the court held that this would make no difference.

The case of McCauley v. Norcross, 155 Mass. 584, 30 N. E. 464, appears to be directly in point. The defendants were erecting a building. The plaintiff, a laborer employed by them, was working on the second floor of this building. On the third floor, some iron beams were so placed near an open hole in the floor that, when the superintendent was passing by, he inadvertently pushed one of the beams with his foot, which fell through the hole, onto the plaintiff below. It was admitted that the plaintiff was engaged in his regular occupation at the time, and that he was in the exercise of due care. The defendants requested the trial court to rule that, upon all the evidence, the plaintiff could not recover. This the court refused to do, and submitted the case to the jury, which returned a verdict for the plaintiff. The only question presented by the bill of exceptions was whether, in any aspect of the case, there was sufficient evidence to go to the jury. The appellate court held that there was sufficient evidence of negligence to go to the jury, and said:

"Upon these facts the jury might find that the iron beams were negligently so placed and left that one of them would be liable, from a slight, inadvertent

push of the foot of a passer-by, to fall through the hole. Being left in this condition for two or three days, the jury might infer a lack of due and proper superintendence. Allowing such things to be negligently left for so long a time in a position where they were likely or liable to be toppled over, and one of them to fall through the hole in the floor, would warrant a finding of negligence on the part of the superintendent in exercising superintendence. * * * If the beams were so left that one of them would be liable, as a natural consequence, from some intervening cause or agency, to be so moved that it might fall through the floor, the fact that an intervening act or agency occurred, which directly produced the injurious result, would not necessarily exonerate the defendants from responsibility. Superintendence is necessary in order to guard against injuries from such intervening and inadvertent acts of careless persons as are likely to happen, and ought to be guarded against. The question is whether the moving of a beam was so likely to occur that it ought to have been provided against by the superintendent. It might be found that the beams were negligently left near the hole in the floor, where they were likely or liable to be toppled over so that one of them might fall through the hole, and thus injure some one below, and that this was the proximate cause of the plaintiff's injury, although some careless person came along and toppled them over;" citing several cases.

See, also, Johnson v. Bank (Wis.) 48 N. W. 712.

But it is unnecessary to elaborate further on this feature of the case. The whole proposition upon the burden of proof is thus summed up in Shear. & R. Neg. (3d Ed.) § 13:

"The plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant, and of resulting injury to himself. Having done this, he is entitled to recover, unless the defendant produces evidence sufficient to rebut this presumption. Though it is not every accident that will warrant an inference of negligence, yet it is not true that no accident will suffice for this purpose. If the plaintiff proves that he has been injured by an act of the defendant, of such a nature that in similar cases, where due care has been taken, no injury is known to ensue, he raises a presumption against the defendant, which the latter must overcome by evidence either of his carefulness in the performance of the act, or of some unusual circumstance which makes it at least as probable that the injury was caused by some circumstance with which he had nothing to do as by his negligence."

Under the facts and circumstances of this case, and the authorities referred to, it is my opinion that the act of placing and of leaving the keg, previously described, on the hatch covers, so close to the hatchway that it was liable to be knocked into the hold, and was in fact tipped over and did roll into the hatchway through an intervening cause or agency, was such negligence as to render the claimants, in view of the duty they owed the libelant as a stevedore on board the vessel, liable in damages for the injuries suffered thereby.

It is strenuously contended by counsel for claimants that the injury should be attributed to an inevitable accident, as the stepping upon and tipping of the hatch covers, which caused the keg to roll into the hatchway, was purely accidental, the injurious results of which to libelant could not be reasonably foreseen or apprehended. But this defense cannot be allowed where the negligence of the claimants has concurred with the accident which caused the injury to libelant. "In order to prove that an accident was inevitable, it is not always enough to show that, under the circumstances existing at the time, it could not be avoided. It must also be the fact that the defendant was not in fault in bringing about any of those circumstances." Shear. & R. Neg. (3d Ed.) § 5. As was said in Austin v. Steam-

boat Co., 43 N. Y. 75: "A party cannot avail himself of the defense of 'inevitable accident,' who by his own negligence gets into a position which renders the accident inevitable." Under the facts of this case, the defense of inevitable accident cannot avail the claimants. Bridges v. Railway Co., L. R. 6 Q. B. 377, 391.

We next take up the question of damages. That the libelant was very seriously injured is clearly established by his own testimony, and that of the physicians who testified. The severity of his injuries is not disputed. His skull was fractured by the blow, resulting in paralysis and permanent injury of a very grave character. It was testified that there was also a possibility of imbecility or insanity supervening as a consequence of the injuries he had sustained, and that his earning capacity had been entirely destroyed, with no prospect of recovery. When injured, he was 29 years of age, and in good health. He was unmarried, and his earnings amounted to $3 a day as stevedore and longshoreman. I think that, under all the circumstances of the case, and, particularly, in view of the fact that his earning capacity has been destroyed, the libelant should be allowed the gross sum of $6,000. A decree in that amount will be entered in favor of the libelant, with costs.