## YOUNG v. CORRIGAN.

(District Court, N. D. Ohio, W. D.   March 18, 1912.)

### No. 7,902.

1. BREACH OF MARRIAGE PROMISE (§ 22*)—EVIDENCE—PLAINTIFF'S PRIOR CHARACTER—MITIGATION OF DAMAGES.

In an action for breach of marriage promise in which defendant claimed that plaintiff was immoral, evidence of her prior misconduct was admissible both as bearing on the issue of the making of the contract and in mitigation of damages.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31–36; Dec. Dig. § 22.*]

2. BREACH OF MARRIAGE PROMISE (§ 35*)—DAMAGES—INSTRUCTIONS.

In an action for breach of marriage promise, an instruction that plaintiff's character was proper for the jury to consider in determining whether there was a contract and also on the issue of damages which in such case depended in some measure on the relation which plaintiff sustained in the community in which she lived and on her capacity to suffer from the affront which a breach would bring to her, and defining reputation, was proper.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 51; Dec. Dig. § 35.*]

3. BREACH OF MARRIAGE PROMISE (§ 22*)—EVIDENCE—PLAINTIFF'S MISCONDUCT.

Where, in an action for breach of marriage promise, plaintiff claimed aggravated damages for seduction, evidence of her previous immoral conduct and evidence of specific acts as well as reputation was admissible without reference to whether defendant had knowledge of her history at the time of the alleged promise or not.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31–36; Dec. Dig. § 22.*]

4. TRIAL (§ 255*)—EVIDENCE—LIMITATION—NECESSITY OF REQUEST.

Where evidence is admitted for a particular purpose only, it is plaintiff's duty to request an instruction limiting its effect, if one is desired.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 627–641; Dec. Dig. § 255.*]

5. BREACH OF MARRIAGE PROMISE (§ 35*)—TRIAL—INSTRUCTIONS.

In an action for breach of marriage promise, an instruction that if the jury found by a preponderance of the evidence that plaintiff was of previous immoral character, and such fact was known to defendant at the time of the alleged contract, they might consider such situation as

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

bearing on the probability of defendant's proposing to make a woman of that character his wife was proper.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 51; Dec. Dig. § 35.*]

6. TRIAL (§ 211*)—INSTRUCTIONS—FAILURE TO CALL WITNESS—INFERENCES.

Where, in an action for breach of marriage promise, the testimony showed that plaintiff's mother was active about the court during the trial, and her name was used as plaintiff's associate in many compromising situations, and her testimony was called for by every consideration of affection and interest, but she was not placed on the stand, the court properly charged that it was proper for the jury to consider plaintiff's failure to call her mother as a witness and draw such inferences as were reasonable from the circumstances because of such failure.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 505; Dec. Dig. § 211.*]

7. COURTS (§ 352*)—PRACTICE IN FEDERAL COURT—INSTRUCTIONS—REFERENCE TO EVIDENCE.

In courts of the United States, the trial judge in submitting the case to the jury may in his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment on the evidence, call their attention to parts thereof which he thinks important, and express his opinion on the facts, and an instruction in the exercise of such power informing the jury, however, that they are the judges of the facts and that their verdict should reflect their own uninfluenced judgment, uninfluenced by the court, except that they are bound to follow the law of the case as given by the court, is proper.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 926–932; Dec. Dig. § 352.*]

8. COURTS (§ 352*)—FEDERAL JUDGE—FUNCTIONS.

A judge of the federal court is not a mere arbitrator to rule on objections to evidence and to instruct the jury on the law, but he is a real part of the machinery whereby just conclusions of fact are reached; it being his duty in the administration of justice to control the inquiry within due bounds and assist the jury to a just determination by such act or interposition as his position and superior knowledge suggest.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 926–932; Dec. Dig. § 352.*]

9. SEDUCTION (§ 5*)—WHAT CONSTITUTES—INSTRUCTIONS.

Where, in an action for breach of marriage promise, plaintiff claimed seduction in aggravation of damages, an instruction defining seduction and charging that plaintiff was not seduced if she voluntarily went with defendant on a long trip with every reason to believe that sexual intercourse would result and was the end sought by defendant, etc., was proper.

[Ed. Note.—For other cases, see Seduction, Cent. Dig. §§ 4–7; Dec. Dig. § 5.*]

10. BREACH OF MARRIAGE PROMISE (§ 22*)—EVIDENCE—CHARACTER OF DEFENDANT.

In an action for breach of marriage promise, evidence to show defendant's general bad character is inadmissible.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31–36; Dec. Dig. § 22.*]

11. BREACH OF MARRIAGE PROMISE (§ 35*)—CHARACTER OF DEFENDANT—INSTRUCTIONS.

Where, in an action for breach of marriage promise, defendant's immoral character incidentally appeared, the court properly charged that such character was not directly in issue, and though it appeared in the evidence the jury should not impose any penalty or bring in any verdict against defendant on account of his character but might consider the

same in connection with the question of the probability of his making the contract sued on.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 51; Dec. Dig. § 35.*]

12. BREACH OF MARRIAGE PROMISE (§ 22*)—CHARACTER OF PLAINTIFF—EVIDENCE—SPECIFIC ACTS.

In an action for breach of marriage promise, evidence that plaintiff had robbed witness in an assignation house of $157 was admissible as bearing on her immoral character.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31–36; Dec. Dig. § 22.*]

13. WITNESSES (§ 355*)—IMPEACHMENT—DETECTIVES.

Evidence of detectives employed to look up the reputation of a witness for truth and veracity is not admissible.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1154–1156; Dec. Dig. § 355.*]

14. DEPOSITIONS (§ 83*)—APPLICATION TO SUPPRESS.

An application to suppress a witness' deposition because of his refusal to answer a question not made until the deposition was offered in evidence was properly denied.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 219–226; Dec. Dig. § 83.*]

15. WITNESSES (§ 270*)—CROSS-EXAMINATION—QUESTIONS—REFUSAL TO ANSWER—STRIKING OUT TESTIMONY—DISCRETION.

Where, in an action for breach of marriage promise, a witness for defendant was asked on cross-examination whether he had had intercourse with plaintiff on a certain occasion, it was within the discretion of the court not to compel the witness to answer, and hence his refusal to answer the question was not ground for striking his testimony.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 926, 955–957; Dec. Dig. § 270.*]

At Law. Action by Georgian Young against James W. Corrigan for breach of marriage promise. A verdict was rendered in favor of defendant, and plaintiff moves for a new trial. Overruled.

W. S. Anderson, of Youngstown, Ohio, and John Marron, of Pittsburgh, Pa., for plaintiff.

Samuel H. Holding, of Cleveland, Ohio, for defendant.

KILLITS, District Judge. The issue in this case is a politely made and courteously urged, but nevertheless a sharp, challenge of the fairness of the judge presiding, both in the conduct of the trial and in the instructions to the jury.

Plaintiff was defeated by an adverse verdict in her attempt to mulct defendant for an alleged breach of promise of marriage. The trial developed so much unsavoriness that, for the sake of public decency and that the putrid mass may be undisturbed, we do not largely discuss its features. The plaintiff rested her case, claiming a specific and formal contract to marry, on her own testimony, in which she confessed to a line of conduct before and leading up to and during the continuance of the alleged engagement which created a suspicion that the court's processes were invoked to aid an adventuress. The defense brought out fact after fact of depravity and immoral conduct

imputed to plaintiff prior to the alleged contract, in much of which the mother of plaintiff was associated. Testimony was introduced tending to show that the girl had been used by the mother as a bait to induce well-to-do men of loose morals into compromising positions that they might be blackmailed.

[1] The testimony concerning the conduct of plaintiff prior to the alleged breach of contract was clearly competent. A sufferer from a broken contract of marriage may demand damages by way of compensation for injury to reputation and character and for humiliation endured. This is elementary, and, by way of mitigating damages, testimony that the plaintiff was at the time she sustained damages a prostitute, an adventuress, a woman of lewd and low report among her fellow citizens was admissible beyond the possibility of question. Such a woman cannot possibly sustain the same degree of injury to reputation and character as a noble woman, because she has less of either to be affected. A common prostitute cannot suffer humiliation to·the same degree as a woman of pure character and deportment. Wigmore on Evidence, §§ 75, 206; Jones on Evidence, § 151; Wharton on Evidence, § 52. The latter author says:

"When the plaintiff claims that his character has been damaged and his feelings crushed by such a breach of promise, then in mitigation of damages it may be shown that he had no character to be hurt by the breach and no feelings that would be particularly shocked."

[2] This instruction, to which plaintiff objected, we think therefore was entirely proper:

"To some extent, as you have already seen, the character of the plaintiff is proper for you to know in determining whether or not there was a contract. It is also essential in meting out justice between the parties to this case, if you get to the point where you think you should award damages to the plaintiff against the defendant, that you should know both the character and reputation of the plaintiff, the woman, at or about the time of the alleged breach of contract, because damages in a case of this kind depend in some measure upon the relation which the plaintiff sustained in the community in which she lived and depend in some measure upon her capacity to suffer from the affront which a breach would bring to her. You will observe that character is what a person actually is. Reputation is what the community in which that person lives thinks such a person is—the estimate that the community places upon such a person. In a breach of promise case the woman may be damaged in her character by the breach and she may be damaged in her reputation, and you cannot know the extent of damage to either character or reputation until you know what they were before the breach."

[3] This line of testimony was also competent as against plaintiff's claim that she was seduced. Her counsel demanded aggravated damages on this ground, although not pleaded. In this light it is not material whether defendant knew her history or not; evidence of previous loose, wanton, and lewd conduct, of specific acts, as well as of reputation, is admissible. 35 Cyc. 1314, note 84.

[4] But plaintiff urges that the court nowhere limited the application of this line of evidence to mitigation of damages. It is perhaps sufficient to answer this by the observation that plaintiff did not ask the court to so limit it, but her counsel confined themselves to general exceptions and failed wholly to except to the charge in this respect.

[5] But this evidence was also admissible touching plaintiff's claim that Corrigan seduced her. Testimony of a courtezan that she was seduced has manifest weakness of credibility. Again, to the extent that her character was known to defendant before the alleged proposal, the evidence thereof was competent for the reason given in this instruction, which also displeased plaintiff's counsel:

"Some testimony has been offered here by way of defense (whether it appeals to you or not is for you to say) suggesting that before the time of this alleged engagement the plaintiff was of unchaste character. If you find that fact to be established by a preponderance of the evidence, if that be the fact, and it is your judgment that her character in that respect was known to the defendant before the night on which this alleged contract was entered into, then you may consider that situation as bearing upon the probability of the defendant's proposing to make a woman of that character his wife."

The record shows that defendant, on the night when he is said to have proposed, had every reason to know, perhaps not all that was shown on the trial, but enough to awaken any mature mind to the belief that he was dealing with an unchaste woman. Pure young women are not understood to freely accompany strange men on a tour of the brothels of a large city, nor to proceed alone 300 miles to become the unchaperoned companions, at a public resort, of young men whom they have never theretofore met except through the medium of an inspection of the "red light" districts. Miss Young, on her own version of the facts, in accepting so readily Corrigan's invitation to become his associate at French Lick, established an accurate measurement of her character for chastity in the mind of every man possessing an average knowledge of human nature or with even ordinary human experience.

If we may accept the testimony of McKesson, Gerlach, Collingwood, and the defendant, the night spent in visiting the various houses of prostitution in Pittsburgh on the occasion when the plaintiff and defendant first met was enough to establish the lack of chaste character on the part of the plaintiff.

The defense, added to the admissions of plaintiff, but strengthened the suspicion that the court was wronged when it was entered to bring such a case, and the extent and character of the rebuttal was awaited with interest. To our surprise, except for attempts to impeach some of the defendant's witnesses, that took the form only of the plaintiff's unsupported denials of the serious matters urged against the plaintiff's character and her deportment. The mother, who had been active in and about the precincts of the court during the trial, and who acted within our observation as mistress of ceremonies for her daughter in receiving reporters and newspaper artists, and whose name had been used as the associate of plaintiff in many compromising situations, and who was shown not only to be her most important witness but one whose testimony was called for by every consideration of affection and interest, was not placed upon the stand.

[6] The omission gave rise to a suggestion in the charge which is urged as error and which appears in the transcript as follows:

"Now, gentlemen of the jury, I have this notion about a lawsuit, that it is the function of the lawsuit to get at the truth of a case and that it is the

duty of the parties to a lawsuit to exhaust reasonably within their power, as the jury reasonably sees the power is within their reach, the avenues of testimony leading to a determination of the truth, and, in determining where the facts of this case lie, it is proper for you to look to the manner in which this case is presented to you to determine whether or not the parties to this case, either or both of them, have reasonably exercised the opportunities open to them to enlighten you as to what the facts are, and if you find in the reason of things, as these circumstances illuminate your judgment, that there were reasonably at hand, within the command of either party to this case, witnesses who might give you valuable testimony upon any proposition, who were not put upon the stand, you are permitted to draw such inferences as reasonable men would draw under such circumstances from the failure to employ such opportunity. Only reasonable diligence in the elucidation of the truth is required of the parties, but there has appeared in this case a series of matters upon which one witness appears from this testimony to have been capable of speaking, who was not placed upon the stand—the mother of the plaintiff. She could have told us whether or not, in some degree at least, the witness Tom Mack told the truth. She could have told us in some degree or not whether in fact the plaintiff got home from Cleveland on the morning of July 1st or later. She could have told us whether or not the plaintiff had an engagement ring produced at or about the illuminating time. She could have thrown some light upon the credibility of Mrs. Jacobs and Mrs. Harrington. She could have told us something about Mt. Clemens and the conduct of the plaintiff there. She could have told us something about this charge against the plaintiff of drinking. And I regret, in the capacity of the court, affording full opportunity to throw onto these transactions all the light reasonably possible, that she was not put upon the stand, and it is for you to draw such inferences as are reasonable under the circumstances because of the failure to put this person upon the witness stand. And if in your consideration of this case, as you review the testimony and go down the procession of witnesses and the series of facts to which they attempt to testify, you find that the defense any place was derelict in the exercise of reasonable diligence in putting the testimony of witnesses before you, you will draw just exactly the same inferences against the defendant."

The references here made were to the more pronounced instances shown in the testimony in which the mother largely figured with the plaintiff as to which her testimony seemed to be clearly demanded. We think it was not only proper but, in the interests of justice, the court's duty to give to the jury this instruction.

It is approved and universal to permit counsel to comment on the failure to offer or account for the absence of a witness shown in the testimony to be in position to know material facts. This is so because such failure raises a presumption that his testimony would be damaging to the party who seems from the state of the record to be called upon to produce him.

[7] The rule is now well settled that:

"In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts; and the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed on writ of error." Vicksburg Railroad Co. v. Putnam, 118 U. S. 545, 553, 7 Sup. Ct. 1, 2 (30 L. Ed. 257).

The instruction quoted and excepted to is clearly not an expression of opinion upon the evidence but a reference only to a situation in the

state of the record out of which a presumption arises which the jury may indulge. It would seem very plain that a court which may at its discretion comment upon the evidence to assist the jury in arriving at a just conclusion may suggest a presumption useful to them to arrive at a just conclusion.

It is possible that the full record may disclose some acerbity of comment by the court. The frequent reiteration by plaintiff's Pittsburgh counsel, whose clientage in part, as shown in the testimony, was in the purlieus of the Smoky City, of an opinion that Pennsylvania practice was superior to that of Ohio, occupying, in advancing such immaterial views, an attitude, thinly veiled by courtesy, of contempt for the court's ignorance, which apparently he could excuse only because of the inferiority of the Ohio procedure in whose defective environment we were professionally and judicially reared, was at times a trifle irritating. However unfortunate and improvident these comments were, we are certain that they cannot be held to be prejudicial to the extent of overthrowing a verdict based upon evidence so strong as to justify the extension of a suspicion, at first engendered from the plaintiff's own testimony, into an opinion at the close of the testimony, and still entertained, that the court's processes and assistance were invoked by plaintiff and her mother to promote a blackmail. Indeed, this record is so conclusive against their client that we are able to explain the pressing of the case again to the court by counsel who remain in it, and who enjoy the fullest measure of the court's respect, only on the theory that they have allowed a chivalric feeling for the plaintiff on account of her sex to becloud their judgment of the testimony, whose overwhelming weight is against both her character and her case.

Nowhere, either in comment during the trial or in the charge to the jury, did the court go to the extent of discussion warranted under the authority quoted above, nor at any time did it "express an opinion on the facts." The jury was charged as follows:

"Now, gentlemen of the jury, you are the sole judges of the facts in this case. It is proper in proper cases for the court in the federal practice to suggest to you what the court's estimate of facts is. Whether the court in this charge has made that suggestion to you, directly or indirectly, the law is that you should not depend upon any impression that you have as to the court's view as to the facts of the case in the making up of your own judgment. Your judgment of the facts should be your own uninfluenced judgment, uninfluenced by the court, except as you are bound to follow the law of the case as the court gives it to you, and uninfluenced by any insistence of counsel."

Under the rule in the federal courts, this instruction is sufficient to meet any criticism offered against the court's conduct.

[8] The criticism of the court here made must proceed on what Prof. Wigmore (section 784) calls the "sporting theory" of a trial, with the judge as a mere umpire to see that the rules of the game are observed. We agree with the noted author just referred to that one of the vital "marks of regeneration" must be found in the more responsible relation of the bench to the issue. He says (section 21):

"First, the judge must cease to be merely an umpire at the game of litigation. Often he is little more. This, to be sure, is in part the continuance of a

tradition, inherited from the spirit of gentlemanly sportsmanship which dominated the administration of British justice. But it has been intensified, instead of lessened, by the spirit of strenuous struggle and unrestrained persistence which drives the bar of our country to wage their contests to the extreme of technicality. The judge weakly resigns himself to the position of 'a mere automaton, or at most the attitude of the presiding officer of a deliberative assembly, with no greater powers than those of announcing the utterances or conclusions of others.' To this many circumstances conspire. But it is an old and a marked tendency among us; and, until it is rooted out, that early warning of one of the Nestors of our judiciary will still be worth heeding."

Judge Sprague, in United States v. 1,363 Bags of Merchandise, 2 Spr. 85, Fed. Cas. No. 15,964, in language approved by the Supreme Court of the United States (Capitol Traction Co. v. Hof, 174 U. S. 15, 19 Sup. Ct. 586, 43 L. Ed. 873), says:

"The Constitution secures a trial by jury without defining what that trial is. We are left to the common law to learn what it is that is secured. Now the trial by jury was, when the Constitution was adopted, and for generations before that time had been, here and in England, a trial of an issue of fact by 12 men, under the direction and superintendence of the court. This direction and superintendence was an essential part of the trial."

A long line of federal decisions assert the function of the judge to be something more than a mere arbitrator to rule upon objections to evidence and to instruct the jury upon the law; that he is a real and essential part of the machinery whereby just conclusions of fact are reached; and that it is demanded of him, in the interest of the due administration of justice, that he control the inquiry before him within due bounds and assist the jury to a just determination by such active interposition as his position and superior knowledge suggest to be proper. Such consideration of the judicial office is at the basis of the decisions in Vicksburg Rd. Co. v. Putnam, supra, United States v. Philadelphia & Reading Railroad Co., 123 U. S. 113, 8 Sup. Ct. 77, 31 L. Ed. 138, and Capitol Traction Company v. Hof, 174 U. S. 1, 19 Sup. Ct. 580, 43 L. Ed. 873. Having reference to the whole state of the record, the trial judge in this case did not exceed his plain duty in the conduct of the trial with respect to the matters criticised.

[9] An exception is taken to the court's charge on the subject of seduction, which was in this language:

"Now, gentlemen of the jury, I am not instructed as to what course the federal courts would pursue upon the question of whether or not seduction should be considered in aggravation of damages by any precedent that has come to my attention. In some states that question is not to be considered at all, but I think the current of authority is, and I shall adopt it for your instruction here, that in a case where a breach of promise of marriage is at issue, in which seduction has followed the making of the contract, that fact is proper to be considered by the jury by way of enhancing or enlarging damages. So, as there is something of that sort claimed in this case, I want this jury to go out of the box with a very clear understanding of what seduction is. It is not sexual intercourse merely between a woman theretofore chaste and a man. It is not merely the despoiling of a woman's virginity, not merely the dragging the woman down from a life of chastity to unchastity, but it is the despoiling of a woman's virtue against her will, yielding to seductive influences on the part of the man which she cannot fairly withstand. A girl theretofore pure in act, then unspoiled in act, but coming to the sexual act will-

ingly, consciously, and in that mind participating, is not seduced. So you may go to the circumstances which preceded the going of the plaintiff to French Lick; you may consider the degree of intimacy between the parties prior to her going there, the brief association they had together, and the places in which and the circumstances under which they associated in Pittsburgh before she went to French Lick, whatever those places and circumstances you find to have been; you may consider the manner in which she was procured to go to French Lick; you may consider her confessed deception of her mother, the distance she had to go, the knowledge of conditions when she got there, where she was and how she was surrounded by these men who were (one of them at least) a total stranger and the other of brief acquaintance, and then, gentlemen of the jury, you are permitted to draw from those circumstances and any other circumstances that in your judgment illuminate her mind and disposition such inferences as appeal to your judgment and determine whether the first act of sexual intercourse which she had with the defendant was an act of seduction or was an act which she could reasonably have anticipated would be one of the fruits of her trip to Indiana, and if you find it was the latter, if you find it was one which she could have and should have reasonably anticipated, with what knowledge of the defendant she had as you find it in this testimony. I say to you that that was not a seduction, no matter whether she had theretofore been pure or not."

This is but a proper phrasing of the accepted definition of seduction and as applied to this case states the law correctly. Patterson v. Hayden, 17 Or. 238, 21 Pac. 129, 3 L. R. A. 529, 11 Am. St. Rep. 822; State v. Eckler, 106 Mo. 585, 17 S. W. 814, 27 Am. St. Rep. 372; State v. Hamann, 109 Iowa, 646, 80 N. W. 1064; Hood v. Sudderth, 111 N. C. 215, 16 S. E. 397; Stowers v. Singer, 113 Ky. 584, 68 S. W. 637; Brown v. Kingsley, 38 Iowa, 220.

The setting of this instruction regarding the reference to matters in evidence is well within the province to comment, as defined in the authorities cited elsewhere.

[10] We are criticised because we did not permit evidence intended to show the general bad character of defendant but are not referred to any authority supporting the admissibility of such a line of testimony in a breach of promise case; nor does extended research on our part disclose that it ever occurred to any one prior to this trial that the woman could support her case in this way. We regard our action as a mercy to plaintiff, for it seems logical to argue: First, that one as depraved as plaintiff tried to show defendant to have been would be least likely to make the lofty Laura Jean Libbey style of proposal which she put in his mouth, language, and phrasing, whose literary flavor was so dissonant from his epistolary efforts and his testimony; and, second, the more dissolute he is shown to be the stronger would grow the presumption that his invitation to French Lick was for lewdness rather than to propose holy matrimony.

[11] Incidentally his character cropped out, whence this instruction:

"The character of the defendant in this case is not directly at issue. The character of the defendant is known to this jury because it is in evidence. The jury is not here to impose any penalty or bring in any verdict against the defendant on account of his character, but you have a right to consider and should consider his character, as you know it from this evidence, in connection with the question of the probability of this contract and as having possibly some bearing in deciding whether or not he was likely to make such a contract as is charged against him."

This was excepted to. We are unable to see any error here. Defendant's disposition to be low in mind and action was an incident which the jury could consider. Obviously he could not offer it by way of defense. She ought not to ask to show it, for it would be against her; but, if it appeared as a setting for competent testimony, it was a proper subject for instruction.

[12] Many of the matters urged in argument were not saved on the record. We have indicated our view of the weight of the evidence elsewhere. Strenuous argument is offered that the court erred in permitting the testimony of one Thomas Machoviak, otherwise Tom Mack, who testified that he had been robbed in an assignation house by plaintiff of $157. We have examined the record as to this testimony and find that nowhere was objection made or exception taken. However that may be, the testimony was clearly competent as bearing upon the character of the plaintiff.

We will notice but two other propositions urged in support of the motion for a new trial.

[13] A detective was employed by the plaintiff, as the result of an item of testimony offered in defense, to go to the town where the witness in question formerly resided and there make inquiry touching the reputation for truth and veracity of the witness, with a view of qualifying such detective to be a witness on rebuttal in impeachment. This the court refused to permit. As to this, the rule laid down in Wigmore on Evidence, § 692, undoubtedly states the law:

"The admissible reputation is that which is built up in the neighborhood of a man's domicile or in the circle where his livelihood is followed, and it is of slow formation. It is the sum of all that is said or not said for or against him. Consequently its tenor can be adequately learned only by a residence in the place, not by a mere visit of inquiry, or by a casual sojourn, or by a conversation with a resident who reports the reputation."

The court's refusal to permit this testimony was undoubtedly right. It is not difficult to see the opportunity for gross abuse, if it were permissible to attack reputation through the hiring of investigators.

[14] Much of the testimony was by deposition. A witness by the name of Kennelly was subjected to a very rigorous cross-examination by the plaintiff's attorney, who pressed him repeatedly to say whether or not on one occasion he had had sexual intercourse with plaintiff. The witness, after many evasions and equivocations, finally flatly refused to answer, and a motion was made to the court, but not until the deposition was offered in evidence, to suppress it because of this refusal of the witness to answer this question.

[15] This motion was overruled: First, because no application was addressed to the court to suppress it prior to the beginning of the trial, the deposition having been on file for more than a year (Bird v. Halsy [C. C.] 87 Fed. 671); and, secondly, because the question in cross-examination was one which it was clearly within the discretion of the court to permit, and his refusal to answer it, if he had been actually on the stand, if not procured by the party calling him, would not have been ground for striking out his testimony. No reason is apparent why plaintiff's counsel should have so pressed the witness

for an answer to the question, which, if answered in the affirmative, would have reflected upon his client and, if in the negative, would not have advanced plaintiff's interests. We see no error here.

The motion for a new trial will be overruled.