## PATTON–TULLY TRANSP. CO. v. BARRETT.

Circuit Court of Appeals, Sixth Circuit.
January 17, 1930.

No. 5244.

R. G. Brown, of Memphis, Tenn. (Abe D. Waldauer, of Memphis, Tenn., and Irwin S. Rosenbaum, of Cincinnati, Ohio, on the brief), for appellant.

Charles H. Stephens, Jr., of Cincinnati, Ohio (Stephens, Lincoln & Stephens, of Cincinnati, Ohio, on the brief), for appellee.

Before MOORMAN and HICKS, Circuit Judges, and HAHN, District Judge.

HAHN, District Judge. By a charter party entered into on the 14th day of August, 1925, appellant, Patton-Tully Transportation Company, libelant in the court below, agreed to let, and Oscar F. Barrett, appellee, respondent in the court below, agreed to hire, the steamer Dan Quinn for a period of six months from the date of the delivery of said vessel, or from the 19th day of August, 1925. On the latter date said Oscar F. Barrett took over said vessel, but during the month of November, 1925, notified the libelant that it was the belief of respondent that said vessel had become unseaworthy, and that it was dangerous to further use her for the purpose for which she had been let. On December 2d respondent brought said vessel to the port of Memphis, and undertook to make delivery of her to libelant. Libelant refusing to accept delivery, respondent withdrew his crew from said vessel, and abandoned her on

the 11th day of December, 1925. Ultimately libelant took over and repaired said steamer, and in its libel and complaint prayed that respondent be required to pay the costs of repairs in the amount of $5,644.65, and rentals for the balance of the term of the charter party in the amount of $3,950.

On the 18th day of May, 1925, two government local inspectors of the Steamboat Inspection Service, operating under the Department of Commerce, made their annual inspection of the steamer Dan Quinn, advised certain minor repairs, and thereafter granted a certificate of inspection. Immediately prior to her taking over by the respondent, the steamer Dan Quinn was not engaged in navigation, but remained at anchor in Wolf river. She was again inspected by the same government local inspectors on December 4, 1925. Said inspectors then advised that among other repairs nine floor frames be repaired, and at that time her certificate of inspection was withdrawn.

On February 26, 1926, the Dan Quinn having been placed in dry dock, a further examination was made by the two government local inspectors, and among other repairs said inspectors found that it was necessary to remove all floor frames under the boilers and to replace them with heavier frames.

Both the libel and the answer filed in the District Court agree that on the 2d day of December, 1925, repairs were necessary to put said steamer Dan Quinn in safe and seaworthy condition. Libelant claimed that the damage which necessitated these repairs was due to the acts or negligence of the respondent, for which, under the terms of the charter party which will be hereinafter set out, respondent was liable. The position of respondent was that upon the date of the charter party the steamer Dan Quinn was unseaworthy because of hidden deterioration and decay, and that such condition became gradually aggravated to an extent making further navigation of the steamer dangerous to life and property.

There is substantial agreement among the parties that the unseaworthy condition of the steamer was caused by the breaking down of the floor frames under the boilers, and by the bulging in or collapsing of the hull or skin of the steamer under said floor frames, causing a "dent or belly" about 3 or 4 inches deep. The evidence in the main is directed to the narrow issue as to what caused this unseaworthy condition.

The steamer Dan Quinn is a steel boat about 135 feet long, 30 feet beam, 5 feet in

depth, and is divided into five water-tight compartments by four collision bulkheads of ¼ inch steel running from the bottom plates of the hull to the deck plates. Each of these compartments is subdivided into three parts by longitudinal bulkheads riveted to angle irons on the collision bulkheads, and extending from the deck beams to within 6 inches of the bottom plates. These bulkheads are riveted to the port and starboard bulkheads. The controversy here centers around the second compartment which is a water-tight compartment extending from bulkhead No. 1 in the bow of the steamer to bulkhead No. 2, a distance of about 30 feet. It is over this compartment that the boilers were installed, and the damage, decay, and deterioration were in this locality. Between the above bulkheads there are 13 floor timbers or floor frames, also referred to as "Z-bars," spaced about 24 inches apart. They start at the top of the gunnel on one side of the hull, pass down the side and around the knuckle and across the bottom of the steamer to the other side. These floor timbers, floor frames, or Z-bars are built up of 2-inch angle irons, ¼ inch in thickness, and are connected by a web or plate of steel 6 inches wide. It is and always has been the claim of respondent that the deterioration and decay which caused the unseaworthiness was in these webs or plates of steel 6 inches wide.

It appears that at the date of the charter party the steamer Dan Quinn was about 25 years old; that she had been at one time a ferry or packet boat; that in 1919 she had been transformed into a tow boat, and at that time her boiler equipment had been increased from two to four boilers, thus increasing the weight and strain upon the floor frames under said boilers. At the date of the charter party some of her floor frames were rusted, and they were always more widely spaced than was consistent with the best practice in boat building.

Shortly after respondent put the Dan Quinn into use, the results of the deterioration in her floor frames began to manifest themselves in the steam line. The joint in the pipe at one time pulled apart, the bolts at the throttle valve were continually breaking, and the crew were continually repairing this recurring damage. Ultimately the crew were fearful that the steam pipe would "let go and scald somebody." On November 30, respondent wrote to libelant and advised that his crew had gone over the steamer, ascertained her damage, and that they reported nothing but deterioration. He advised that some agreement be reached between the parties, and, if that could not be done, respondent would have the government inspectors examine the boat. Libelant failing to co-operate in this respect, respondent caused an examination to be made by the government local inspectors, and on December 5th advised libelant of this examination, and that it verified his fear that the steamer was not in condition to be operated without repairs. Respondent was claiming that the damage was due to deterioration, and the letter of the local inspectors under date of December 5 advised that the damage was in the floor frames under the after end of the boiler. It is also clear from the correspondence that libelant knew that respondent carried insurance to cover damages from injuries due to accidents of navigation. Without attempting to co-operate with respondent in any way in determining the cause or extent of the damage, libelant on the 17th day of December, 1925, in an ultimatum letter, advised respondent that, unless he made the necessary repairs to the steamer before January 1st, it would be sent to the shipyards at New Orleans and repairs made at the expense of the respondent.

Respondent advised that he had shown a copy of the report of the Principal Surveyor of The American Bureau of Shipping to Mr. Tully of the libelant company; that the report showed that the steamer was not in condition when received by respondent; and that, respondent declined to make any repairs. Later respondent requested to be advised a few days in advance when the boat would be placed in dry dock; and advised that "we will have our representative to look her over when she is out." Ultimately the boat was placed in dry dock, not at New Orleans, but at Memphis, without any notice whatsoever to respondent, and eight or nine of her floor frames were replaced.

To sustain its contention libelant offered only the opinion evidence of the government local inspectors, Wyckoff and Greenwood, a superintendent of a dry dock, Sescher, a manager of the company which made the repairs to the floor frames, Stanton, a boiler maker, Booth, the dry dock owner, C. E. Kennedy, and several others. All of these witnesses testified that the damage to the floor frames and the damage to the hull was caused, not by deterioration, but by outside causes, such as a collision, the striking of a snag, or the grounding of the steamer. Nearly all of these witnesses admitted that there was some rust and deterioration in the floor

frames involved;[1] and the witness Wyckoff, one of the government local inspectors, who was entitled to as favorable consideration as any of the witnesses for libelant, admitted that the damage to the hull and to the floor frames might have been caused as well by the upward pressure of the water upon weak and deteriorated floor frames. This witness also was of the opinion that the greatest stress and strain was upon the floor frames under the boilers, and for that reason advised replacement of these floor frames by heavier frames.

■■■ The testimony of libelant must be weighed having in mind its unaccommodating attitude in not affording respondent an opportunity to examine the damaged floor frames after the steamer had been placed in dry dock at Memphis. Libelant knew definitely that respondent claimed that the damage to the floor frames was the result of deterioration, and that, if it was due to any other cause, libelant was probably covered by insurance. Libelant also knew that the cause of the damage would have to be determined in this litigation. Without notice to respondent, who was expecting the steamer to be placed in dry dock at New Orleans, libelant placed the steamer in dry dock at Memphis, and respondent never had an opportunity to examine the steamer in dry dock. The attitude of libelant in this respect supports an inference that the result of a joint examination of the floor frames in dry dock would have been unfavorable to it.

Further it appears that the floor frames which were taken out had been burned into "pieces that were easy size, practical size to get out." In the circumstances, if these pieces did not then disclose the character and extent of the deterioration, the floor frames should have been taken out in some other way, and preserved, and, if produced at the trial, would have shown with certainty and conclusiveness whether these frames had gradually deteriorated, as claimed by respondent's witnesses, or whether they had been crushed, mashed, or crumbled as a result of an accident, as claimed by libelant's witnesses. Courts have often held that the failure upon the part of a litigant to produce demonstrative evidence under his control justifies the inference that its production would have operated unfavorably to the cause of such litigant. The Phœnix (D. C.) 34 F. 760, 762; ·The Luckenbach (D. C.) 144 F. 980, 981; Missouri, K. & T. Ry. Co. v. Elliott (C. C. A. 8) 102 F. 96, 102; and see Kirby v. Talmadge, 160 U. S. 379, 383, 16 S. Ct. 349, 40 L. Ed. 463; Hyams v. Calumet & Hecla Mining Co. (C. C. A. 6) 221 F. 529, 540; Young v. Corrigan (D. C.) 208 F. 431, 436, affirmed Young v. Corrigan (C. C. A. 6) 210 F. 442.

■■■ The testimony offered on behalf of respondent in our opinion far outweighed that of libelant, and was to the effect that the cause of the unseaworthiness of the steamer was the gradual decay and deterioration of the eight or nine floor frames which were replaced. Among other witnesses respondent offered the witness Linfield, a marine surveyor, who for ten years had been in the employ of the American Bureau of Shipping, which corresponds to Lloyds' Register of Shipping in England. He had examined the Dan Quinn on December 8, and had extensive experience in the inspection of ocean-going ships and river craft. His testimony was impressive, covered all of the vital features of the case, and he was subjected to a rigid and extensive cross-examination. He testified in open court, and the trial judge had the opportunity of seeing and hearing him, and to consider his testimony in the light of his explanations in connection with a model of the steamer and other exhibits. That the trial judge believed this witness appears from his opinion in the case, and it was partially supported by some of the libelant's witnesses, and especially by the crew of the steamer who testified that (with two exceptions to be presently noted) there was no incident or mishap in the navigation of the Dan Quinn which might have caused the extensive damage to the skin of the hull and the floor frames. They further testified that the damage did not make a sudden or abrupt appearance, but appeared gradually, and grew continuously worse.

· It was testified by the crew that upon one occasion, at Hale's Point, the steamer was coming down the river and had a barge to leave at the Mengel Box Company, at Hale's Point. It appears that at that point something got into the rudder or wheel, but no jar or jolt of any kind was felt; and that the evidences of injury to the steam line and the valve joint had manifested themselves before that time. On another occasion, at New Town Bend, which is about 20 miles south of Vicksburg, one of the barges which was being pushed upstream went up on, and would not go over a reef. The Dan Quinn, however,

---

[1] The witness Wyckoff testified that there was "more or less deterioration in the frames"; witness Tully, that there was "some deterioration"; witness Stanton, "Oh, yes, yes, they were rusted"; witness Norville, "They were rusted"; witness Booth, "some rust"; and witness C. E. Kennedy, "some deterioration there."

was at no time involved. Whatever happened at these times was nothing beyond what seaworthy river craft upon the Mississippi are expected to withstand. The Northern Belle, 9 Wall. 526, 19 L. Ed. 746.

In addition to the damage to the skin of the hull under the damaged floor frames, there was also a sharp indentation in the hull of the boat, being about 2½ inches at its center, and sloping gradually out circularly about 3 feet. We are satisfied from the testimony that this indentation was of slight consequence; that it did not tend to make the steamer unseaworthy; that there is no evidence that this indentation was caused by navigation by respondent; and that the steamer had probably sustained this indentation before she was turned over to respondent. The cost of repairing it was inconsequential. We are satisfied from the testimony that this indentation was the result of a cause wholly unconnected with the other damage to the steamer which caused her unseaworthiness.

But one witness for libelant testified in open court; that was the witness Tully, an officer of the libelant company. He described the damage to the steamer, but did not give an opinion as to the cause of the damage. All the other witnesses for libelant testified by deposition, and this is true as to all of the witnesses of respondent who testified to the cause of the damage except the witness Linfield. As to the deposition testimony, the rule as to the weight usually accorded to the findings of a trial judge would perhaps not apply. Mt. Vernon Refrigerating Company v. Fred W. Wolf Company (C. C. A. 6) 188 F. 164, 168. But if we were in doubt after our own consideration of the testimony, we would not be justified, we think, in finding contrary to the findings of the trial judge because of the important bearing upon the case of the testimony of the witness Linfield, who testified in open court. His testimony was believed by the trial judge, and, notwithstanding the presence of deposition testimony, the trial judge's findings, under the circumstances, were entitled to great weight. City of Cleveland v. Chisholm (C. C. A. 6) 90 F. 431, 434; The Edward Smith, 135 F. 32, 39 (C. C. A. 6); Monongahela River, etc., Co. v. Schinnerer, 196 F. 375, 379 (C. C. A. 6); and U. S. v. Marshall (C. C. A. 8) 210 F. 595, 597. The testimony of the witness Linfield, believed by the trial judge, was practically determinative of the case, and he was corroborated by all of respondent's witnesses, and, to some extent, by libelant's witnesses.

Our findings are in all respects in accord with those of the trial judge. In our opinion, the unseaworthiness of the steamer Dan Quinn was due to the gradual breaking down of the floor frames under the boilers due to decay and deterioration from the weight of the boilers, the varying degrees of heat from the boilers, the moisture and ashes therefrom, and the vibrations of the steamer which became greater as the deterioration and decay increased. In our opinion, because of the condition of the Dan Quinn when she was turned over to respondent, all of these factors gradually operated to make her unseaworthy.

It is urged on behalf of libelant, however, that under the terms of the charter party respondent is liable, even if the unseaworthiness was caused by damage from decay and deterioration, as we have found. Libelant claims (1) that under the terms of the charter party there was no implied warranty of seaworthiness because the steamer was taken by the charterer on his own inspection, and that all the alleged defects were patent; (2) that under the terms of the charter party respondent had "the privilege of returning the boat and cancelling the charter at the expiration of thirty days, provided the boat did not meet with their needs;" that the failure of respondent to notify libelant of the alleged defects within a reasonable time after discovering them constituted an election to continue the charter party past the 30-day period, and that respondent was estopped from claiming the right to terminate the charter party at a later date; and (3) that, because respondent was "to assume full responsibility for the boat" and "to return the boat * * * in good working order and repair," respondent assumed liability for injury or damage due to unseaworthiness.

The controlling provision of the charter party is as follows:

"The Patton-Tully Transportation Company agrees to charter the Steamer Dan Quinn * * * to the Barrett Line for a period of six months, at the rate of $50.00 per day, the time of charter beginning on or about the 15th day of August, 1925. The Barrett Line to have the privilege of returning the boat and cancelling the charter at the expiration of thirty days, provided the boat does not meet with their needs. The Barrett Line to assume full responsibility for the boat during the life of the charter and at the expiration of the charter to return the boat to the Patton-Tully Transportation Company's Landing, Wolf River, Memphis, Tennessee, in good working order and repair."

The terms of the charter party containing no provisions to the contrary, there can be no doubt that the law implied a warranty of seaworthiness. The applicable rule is announced in Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012, where Mr. Justice Swayne said, in part:

"Where the owner of a vessel charters her * * * he is bound to see that she is seaworthy and suitable for the service in which she is to be employed. If there be defects known, or not known, he is not excused. He is obliged to keep her in proper care, unless prevented by perils of the sea or unavoidable accident. Such is the implied contract where the contrary does not appear."

The same rule is announced in Williston on Contracts, § 1078, and especially in The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644, where the court held that the warranty applied to latent, as well as patent, defects. The rule is not changed by the express provision of the charter party covering a possible break in the weld of the shaft. The warranty implied by law is not done away with by this less comprehensive express warranty in the charter party. Bowring v. Thebaud (C. C. A. 2) 56 F. 520; Church Cooperage Co. v. Pinkney (C. C. A. 2) 170 F. 266, 269. Nor was the situation changed by the fact that on the 18th day of August respondent made some kind of an inspection of the steamer. This inspection was entirely voluntary on the part of the respondent, and there was no provision in the charter party, either express or implied, obligating the charterer to make such an inspection as in Portsmouth Fisheries Company v. John L. Roper Lumber Co. (C. C. A. 4) 269 F. 586. The charter party had been consummated on the 14th day of August, and the rights of the parties were fixed as of that date. If after that time respondent made an inspection for his own purposes, his rights under the implied warranty survived such inspection. The inspection made of the floor frames was of the most casual character, and did not disclose the extent of the deterioration and decay of the floor frames in the second compartment.

The claim of libelant that respondent relied upon his own inspection is entirely unfounded in the evidence, from which it appears that Mr. Tully, president of the libelant company, advised respondent's representative that the steamer had been inspected by government officials in May of 1925; that she had remained at anchor in the Wolf river from that date to the date of the negotiations; and that Mr. Tully was of the opinion that she was in good condition. The cases cited in which the charterer made his own inspection, or knew of the vessel's condition, before entering into the charter party: Sanford & Brooks Co. v. Columbia Dredging Co. (C. C. A. 4) 177 F. 878, 879; Waterhouse v. Rock Island Alaska Mining Co. (C. C. A. 9) 97 F. 466; Glasgow Shipowners' Co. v. Bacon (D. C.) 132 F. 881, and Glasgow Shipowners' Company v. Bacon (C. C. A. 2) 139 F. 541, are therefore not applicable to this case. And compare The Presque Isle (D. C.) 140 F. 202.

We think also that the implied warranty was not affected by the provision of the charter party that respondent was "to have the privilege of returning the boat and cancelling the charter party at the expiration of thirty days, provided the boat does not meet with their needs."

By this provision of the charter party it was not intended to modify or to supplant the implied warranty of seaworthiness. This provision of the charter assumed the seaworthiness of the steamer, and gave to the charterer a 30-day period in which to determine whether the Dan Quinn, in seaworthy condition, would meet the needs and requirements of respondent. Further, the weight of the evidence is that the unseaworthiness of the Dan Quinn had not become established within the 30-day period so as to justify respondent in taking the drastic action which he afterwards did. It is clear that the unseaworthy condition alone would not have affected ability to navigate the steamer. Mr. Tully testified that, after December 2d, she might have been taken from Memphis to New Orleans, even though her floor frames had decayed and deteriorated and the skin of the hull had been damaged. Respondent was justified in surrendering the steamer because the damage to the floor frames and the hull made it difficult to maintain the tight condition of the steam line and the valve joint, thus auguring probable damage and injury to the steamer and the crew. Repairs had been made from time to time, and it was only at a much later time, about November 30, that the probable future danger justified the surrender of the steamer because of her unseaworthiness.

In no event we think could it be fairly claimed that respondent was estopped after the 30-day period to assert his right to return the vessel, as he did, for it does not appear from the evidence that the libelant was in any way prejudiced or that it changed its position. Columbus S. & H. R. Co. Appeals (C. C. A. 6) 109 F. 177; and Feick v. Stephens (C. C.

A. 6)' 250 F. 185. So far as the evidence shows, libelant benefited by the delay of respondent in keeping the steamer after the 30-day period.

■ Finally, respondent ·had a right to the benefit of the covenant of implied warranty, notwithstanding that he agreed "to assume full responsibility for the boat" and "to return the boat * * * in good working order and repair." The broadest possible scope which might be given to this provision of the charter party would be to make the respondent responsible for the loss of the boat or for any damage or injury to her which might be the result of negligence or causes other than unseaworthiness. The decisions cited by libelant we think are not to the contrary. In the cited cases: Sun Printing & Publishing Association v. Moore, 183 U. S. 643, 22 S. Ct. 240, 46 L. Ed. 366; Dittmar v. Frederick Starr Contracting Co. (C. C. A. 2) 249 F. 437; City of New York v. Clyde Lighterage Company (C. C. A. 2) 13 F.(2d) 533; and Berwind White Coal Mining Co. v. United States (C. C. A. 2) 15 F.(2d) 366, the claimed loss and damage was not due to unseaworthiness, and the courts therefore had no occasion to consider whether the law implied warranties of seaworthiness in the charter parties involved. Compare Bartley v. Borough Development Co. (D. C.) 214 F. 296.

Knappen, Circuit Judge, dissenting.

Though we have not discussed in detail all of libelant's contentions, we have carefully considered all of them. The conclusions we have reached require that the decree of the District Court be affirmed.