CAPEHORN STEAMSHIP CORPORA-TION, as Owner of THE S.S. CHRYSS JANE, Libellant,

v.

The TEXAS COMPANY, Respondent.

No. 2876.

United States District Court
E. D. Louisiana
New Orleans Division.

June 12, 1957.

Phelps, Dunbar, Marks, Claverie & Sims, John W. Sims, New Orleans, La., for libellant.

Terriberry, Young, Rault & Carroll, Benjamin W. Yancey, New Orleans, La., for respondent.

**J. SKELLY WRIGHT, District Judge.**

The real party in interest in these proceedings is libellant's hull insurer for the S.S. Chryss Jane. After indulgently paying its assured's claim, obviously predicated on fabricated log entries, the insurer now seeks in these proceedings to recover against the party allegedly causing the hull damage. In so doing it uses the same fabricated log entries supported primarily by the testimony of their author.[1]

The hull damage here in suit appeared on both sides of the vessel, slightly above and below the waterline and forward of the midship deckhouse. It was damage obviously received over a period of time in a multitude of minor collisions with wharves, barges, tugs, and other vessels which came alongside the S.S. Chryss Jane for various reasons. Under the owner's hull policy, this type of minor damage was not covered since it was below the deductible. By having the damage from these various incidents repaired at one time while the vessel was in dry dock and alleging that it resulted from two collisions, one for each side of the vessel, the owner accumulated a claim against its insurer in the amount of $25,880.88. The insurer paid the claim, perhaps to keep the account, and now makes this forlorn effort to recover its losses.

Libellant alleges that while its vessel, the seagoing tanker Chryss Jane, was anchored at Port Texaco on the afternoon of June 11, 1952, the barge Jeanerette, in tow of the tugs Caillou and Lafitte, operated by respondent, collided with the starboard side of the vessel in coming alongside to discharge oil products. It further alleges that in the early morning of June 12th, the barge Bateman, in tow of the tug Lafitte, also operated by respondent, was in collision with the Chryss Jane, but on the port side, in coming alongside to discharge oil products into the tanker. In support of its contention that the collisions actually happened, libellant relies on the log entries, the testimony of First Officer Brandstrom, who claims to have seen them both, and the master, McClintock, who saw neither. No deck personnel or other persons who may have witnessed the collisions were produced.[2]

Port Texaco is an anchorage in an open roadstead in the Gulf of Mexico off the coast of Louisiana which is used by the Texas Company to load tankers from barges. Barges are brought alongside the tankers by tugs owned and operated by respondent. Lines from the tankers are used in making the barges fast, and tanker personnel move the barges along the side of the vessel to the proper location for discharging their cargo.

Brandstrom testified that on June 11th in the afternoon, the barge Jeanerette was brought alongside the Chryss Jane with such force that he was compelled to advise her master, McClintock, of the incident. He testified that on June 12th in the early morning, the barge Bateman was brought alongside the port side of the Chryss Jane with such force that he was compelled to advise her master of the incident. He testified further that he was not able to see any damage from

---

1. Proctors concerned with this litigation are respected members of the bar of this court. No reflection on their integrity is intended nor should be inferred.

2. See Interstate Circuit, Inc., v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610; The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126; Clifton v. United States, 4 How. 242, 246, 45 U.S. 242, 246, 11 L.Ed. 957.

the collisions at the time while standing on the deck of the vessel because the damage was near to and under the waterline. McClintock, master of the Chryss Jane, also was unable to see the damage from the collisions, but he did support Brandstrom to the extent of testifying that Brandstrom reported them to him. McClintock further testified that, while he was unaware of the collision of June 12th until he awakened later in the morning, he did feel the impact of the collision of June 11th while at supper in the officers' mess.

The log book of the barge Jeanerette shows that it did come alongside the Chryss Jane on the afternoon of June 11, 1952 to discharge cargo. There is no indication whatever in the log, however, that any untoward event, such as a collision, took place. The log book of the barge Bateman also shows that it came along the starboard side of the Chryss Jane in the early morning of June 12, 1952 to discharge cargo. Again there is no indication whatever in its log of a collision. Logs of the tugs which brought the Jeanerette and Bateman alongside the Chryss Jane were also introduced in evidence and they, too, contain no reference to collisions. The only vessel concerned in the operation whose log shows that collisions took place on the days in question is the rough log of the Chryss Jane and it is these log entries which are obviously fabricated.

Brandstrom testified that these log entries were made immediately after the collisions with the Jeanerette and the Bateman. The proof shows that the smooth log of the vessel, which is intended to be an exact duplicate of the rough log, was made by Third Officer Beck of the Chryss Jane several days, perhaps more than a week, after the collisions, and the smooth log does not contain the collision entries. Beck testified that in making the smooth log he copied the rough log. When confronted with the smooth log as prepared by him and the rough log containing the collision entries, he was forced to admit that, at the time he copied the rough log in making the smooth log, the collision entries were not in it. Libellant makes no effort to resolve this conflict between the testimony of Brandstrom, the first officer of the Chryss Jane, and Beck, the third officer. It impliedly admits that the log entries were at best reconstructed at a date subsequent to preparation of the smooth log.

Just when the collision entries were placed into the rough log is a matter of conjecture. Certain it is they were an afterthought. The tugs bringing the barges alongside at the time of the alleged collisions are not mentioned in the entries,[3] apparently for the reason that that information was not available at the time the log entries were confected. The balance of the information contained in the log entries, with the exception of the allegation of a collision, was available in other parts of the log which showed that the barges did, in fact, come alongside the Chryss Jane and discharge at the times shown. However, in his zeal to account for damage on both sides of the vessel, Brandstrom's log entries showed the Jeanerette discharging from the starboard side of the Chryss Jane and the Bateman discharging from the port side. Unwittingly, he placed the Bateman on the wrong side. The log of the Bateman shows that it used its port hose to discharge, which means that the barge's port side was to the starboard side of the Chryss Jane. The Chryss Jane's own log confirms this fact because it shows that at the time of the alleged Bateman collision, the Jeanerette, making its second trip to the

---

3. The log entries in question appear on the wrong side of the page of the log book and out of chronological order. They read as follows:

"1735 while Barge Jeanerette was being maneuvered into position alongside vessel, barge struck starboard side of vessel rather heavily forward of midship house. T.B." (June 11, 1952)

"0510 while Barge Bateman was being maneuvered alongside vessel, barge struck port side of vessel rather heavily forward of midship house. T.B." (June 12, 1952)

Chryss Jane, was also alongside discharging, and the Jeanerette's log shows that it was using its starboard hose, which meant that it had its starboard side to the port side of the Chryss Jane. It is uncontradicted that only two barges could discharge into the Chryss Jane at a time, one on each side.

To support the conclusion that these alleged collisions were afterthoughts, there is other evidence. The personnel of the barges and tugs in suit were produced as witnesses. They testified that the alleged collisions did not occur. The respondent was not notified of the alleged incidents until November 18, 1952, months after the damage from the alleged collisions was repaired while the vessel was in dry dock during the latter part of July, 1952. Respondent was not invited to attend the survey[4] of the damage at the time of the dry-docking and no report of the collisions was made to the United States Coast Guard, either at the time they allegedly occurred or at the time the damage was examined in dry dock in July, as required by Code of Federal Regulations, Title 46, Sub-Part 136.05. Moreover, the libel itself was not filed until August 12, 1954.

In the circumstances above described, it would be asking too much of a court to accept Brandstrom's eyewitness account of the alleged collisions and the fabricated log entries. Courts many times have inveighed against parties who fabricate documents and then perjure themselves to support them.[5] It would serve very little purpose to add more to what has already been written. Suffice it to say that under the law of the sea, when a party comes into court with log entries which will not stand the test of credibility, that party's chance of success in the litigation is little short of nonexistent.

4. See Patton-Tully Transp. Co. v. Barrett, 6 Cir., 37 F.2d 516, 1930 A.M.C. 970; The Westchester, 2 Cir., 254 F. 576, 578; The Cristobal Colon, D.C.S.D. N.Y., 36 F.2d 825, 1930 A.M.C. 48; 15 C.J.S. Collision § 168, p. 186.

In view of this court's holding that the evidence will not support the allegation that the alleged collisions in suit occurred as stated in the libel, it is unnecessary to consider the defense of laches.

Decree for respondent.

5. See Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 102 F.2d 450, 453; The Silver Palm, 9 Cir., 94 F.2d 754, 762, 1937 A.M.C. 1427.