**WABASH RAILROAD COMPANY,**
Libellant,

v.

**THE IRENE CHOTIN, her engines, tackle, apparel, etc., and Chotin Towing Corporation, Respondent.**

No. 2034.

United States District Court
E. D. Louisiana,
New Orleans Division.

Aug. 25, 1959.

---

James J. Morrison, New Orleans, La., for libellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert B. Acomb, Jr., New Orleans, La., for respondent.

J. SKELLY WRIGHT, District Judge.

The Wabash Railroad Company is the owner of a railroad bridge located across the Illinois River at Meredosia, Illinois. In its libel the railroad alleges that, in navigating the west draw of this bridge, the Tugboat Irene Chotin, pushing a tow of two barges downriver, maneuvered the starboard side of the tow into pile cluster No. 2, a part of the shear fence running upriver from the west side of the draw. Respondent admits transiting the draw at the time alleged but denies damaging it.

On May 16, 1950, the Towboat Irene Chotin was proceeding in a southerly direction down the Illinois River, pushing a tow consisting of two empty steel oil barges made up side by side. The Irene Chotin is a pilothouse controlled, steel, twin-screw towboat, powered by two GM Diesel 1200 HP engines, and measuring 128.5 feet in length, 28 feet in width, by a depth of 8.5 feet. The bridge in question is located in a bend of the Illinois River. At this point the river runs generally north and south and the bridge generally east and west. It has two draw spans, the west span being located over the navigable channel of the river. Shear fences composed of clusters of piling, or whalers, fan upriver from each side of the west draw. The width of the draw itself is 114 feet. The width of the Irene Chotin's tow was 100 feet, 50 feet per barge.

At approximately 4:36 on the afternoon of May 16, 1950, the Irene Chotin, after passing under the highway bridge upstream, sounded her signal for the draw on the railroad bridge. The draw was immediately opened and the bridge tender signaled the tow to proceed ahead and pass through.

The current of the river was downstream at 1.5 miles per hour. The pilot of the Irene Chotin reversed her engines, killing off all headway of the tow, then permitted the tow to drift downstream with the current. Because of the narrow opening in the bridge, the port side of the tow of the Irene Chotin was lined up against the east shear fence of the draw. In executing this maneuver, rope fenders were used to cushion the contact between the tow and the shear fence. Using the shear fence as a guide, the tow, followed by the Irene Chotin, proceeded through the draw without incident, the captain of the towboat waving to bridge tender Floyd as he passed and Floyd returning the greeting. Three days after the Irene Chotin passed through the bridge, libellant wrote respondent alleging that the tow had damaged the No. 2 cluster in the west shear fence and making claim for that damage. The claim was immediately denied by Chotin. Eighteen months later this libel was filed.

The only members of the crew of the Chotin still available, the captain and chief engineer, testified unequivocally that neither the Chotin nor her tug came in contact with the shear fence on

the west side of the draw. The bridge tender, Floyd, and his boss, Hobson, tell a different story. Floyd said he stood on the bridge while the tow was lining up to pass through and saw the starboard side of the tow come in contact with the No. 2 cluster, knocking it over. He admits, however, that when the tow passed on through the draw, he merely exchanged greetings with the members of the crew of the towboat and did not in any way indicate that the tow or the towboat had been in contact with a part of the bridge or its appurtenances.

Hobson's story is more remarkable. He stated that he had just left the bridge as the Irene Chotin was lining up to come through the draw, that he was standing on the east bank of the river south of the bridge, some 500 yards away from the pile cluster No. 2, and that he saw the starboard side of the barge come in contact with that cluster. In order to see what Hobson said he saw, he would have had to look through the bridge and the barges which, from the position he was standing at the time of the alleged incident, were in his line of vision.

The testimony of Floyd and Hobson gets more interesting as it relates to the manner in which the collision was entered on the bridge log. According to railroad practice, whenever a vessel causes damage to any part of the bridge, the name of that vessel is logged in red pencil rather than in the customary black pencil used when recording the name of a vessel which had passed through the bridge without incident. Floyd testified that he logged the Irene Chotin with the usual black pencil and that the next morning he and Hobson took the red pencil and went over the black pencil recording. In addition, and at the same time, according to Floyd and Hobson, the words "struck No. 2 cluster" were written in

red in the log opposite the name of the tug Blue Seal which was the last towboat prior to the Irene Chotin to transit the draw. From these words, "struck No. 2 cluster," a line was drawn down to the newly doctored Irene Chotin entry in the log to indicate that it was the Chotin which had actually damaged the cluster. Hobson and Floyd, also at that time, the following morning, prepared a report of the incident for the railroad claim agent and predated the report.

■   This brief analysis will demonstrate that the testimony of Hobson and Floyd is incredible. It would appear from the reading of their testimony that they, as custodians of the bridge, were required to know which vessel struck and damaged the No. 2 cluster. Having failed to see which vessel actually did the damage, they decided it was probably the Irene Chotin. The fact that they tampered with a log entry is sufficient in itself to discredit their testimony.[1] But there is more. How can a bridge tender, who admits he only waved a greeting to a passing towboat, be believed when he states that he saw that towboat damage part of the bridge under his care? How can the testimony of Hobson be believed when to believe him would require that he was able to see through two obstructions in his line of vision? And from a distance of 500 yards.

■   Piling protecting a bridge draw is often weakened by a succession of bumps from passing vessels. Sometimes no damage is suffered, and even when damage is suffered, it may be below the water. Consequently, it is very difficult in some instances to determine which vessel is responsible for the damage. But this difficulty does not relieve the bridge owner of identifying the vessel responsible.[2] Until identification is made

1.  See Lykes Bros. Steamship Co., Inc. v. Union Carbide & Carbon Corp., 5 Cir., 253 F.2d 444; Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 102 F.2d 450, 453; The Silver Palm, 9 Cir., 94 F.2d 754, 762, 1937 A.M.C. 1427; Capehorn Steamship Cor-
poration v. Texas Company, D.C., 152 F. Supp. 33.

2.  River Transportation Company of St. Louis v. Illinois Farm Supply Co., 1954 A.M.C. 515; Branch v. Reading Company, 1947 A.M.C. 480; Newark Terminal & Transportation Co. v. Tug Isa-

by a preponderance of the evidence, the presumption of negligence against a vessel underway striking a stationary object does not arise.[3]

bel A. McAllister, etc., 1944 A.M.C. 295; The Cristobal Colon, D.C., 36 F.2d 825, 1930 A.M.C. 48; The Chippewa, 1929 A.M.C. 317; Brooklyn & Buffalo

Navigation Corp. v. Hudson River Day Line, 1928 A.M.C. 384.

